Argued and submitted December 13, 2004, reversed February 15, 2006

Penny SODERHOLM,
Guardian for Jolynn Soderholm,
*Respondent,*

*v.*

Loren KRUEGER,
*Appellant.*

030769; A121592

129 P3d 764

Kevin T. Lafky argued the cause and filed the brief for appellant.

No appearance for respondent.

Before Landau, Presiding Judge, and Armstrong, Judge, and Deits, Judge pro tempore.

DEITS, J. pro tempore.

**DEITS, J. pro tempore**

Respondent appeals after the trial court issued a permanent stalking protective order (SPO) prohibiting him from having any contact with petitioner.[1] Respondent challenges, among other things, the sufficiency of the evidence to support the issuance of the SPO. We review *de novo, Hanzo v. deParrie*, 152 Or App 525, 537, 953 P2d 1130 (1998), *rev den*, 328 Or 418 (1999), giving deference to the trial court's express and implicit credibility determinations, *Pinkham v. Brubaker*, 178 Or App 360, 362 n 2, 37 P3d 186 (2001). Because we conclude that petitioner failed to satisfy the requirements of the statute, ORS 30.866(1), we reverse.

Petitioner's and respondent's families are neighbors; their properties share a driveway. At the time of the show cause hearing, petitioner was 16 years old. Respondent had moved in next door to petitioner and her family about four years before the hearing. Respondent is a convicted felon who spent 12 years incarcerated after convictions for kidnapping and assault. Respondent offered uncontroverted testimony that he is not a registered sex offender, nor is he required to register as one under Oregon law. It does appear, however, that respondent was at one time charged with a sex offense. At the time that he moved into petitioner's neighborhood, respondent had been out of prison for 12 years. When respondent moved into petitioner's family's neighborhood, his parole officer "informed them [he] was a felon."[2]

---

[1] We explained in *Hanzo v. deParrie*, 152 Or App 525, 527 n 1, 953 P2d 1130 (1998), *rev den*, 328 Or 418 (1999):

"In civil stalking proceedings, the party applying for relief is denominated the 'petitioner' and the party against whom relief is sought is the 'respondent.' Obviously, that nomenclature can be confusing in an appeal like this, where the 'respondent' below is the appellant and the 'petitioner' below is the respondent. Nevertheless, for consistency and in accordance with our own rules governing designation of parties in briefs, ORAP 5.15, all references to 'respondent' are to deParrie and all references to 'petitioner' are to Hanzo."

Similarly, in this opinion, all references to respondent are to appellant Krueger and all references to petitioner are to respondent on appeal. In addition, we use the term "petitioner" to refer to Jolynn Soderholm, not to her mother, who brought this action as guardian for Jolynn.

[2] At the SPO hearing, petitioner's mother attempted to introduce a copy of a "public safety flyer put out by his parole and probation officer clearly listing him as

After respondent moved in next door, petitioner's family put up "no trespassing" signs within 10 feet of respondent's property line. One sign read, "Insured by SMITH & WESSON / security by WINCHESTER / funeral arrangements by REMINGTON & COLT." Petitioner's mother also told respondent orally several times to stay away from her children. She testified that for four years her children have been "coming to me crying, upset, scared wanting him to leave them alone."

During the year before the hearing "or maybe the year before," on one occasion respondent waited at the end of the driveway for the school bus at the time that the bus came to pick petitioner and others up. He then followed the bus to school and turned around after it reached the school. Petitioner reported this to the school bus driver who "made a call."

Two summers before the hearing, petitioner's mother testified that she had come home from work to find her daughters very upset because they had seen respondent in the bushes watching them. Petitioner's mother went outside and confronted respondent, who was standing in his yard about 400 to 500 feet away. She was "very upset" and was "screaming and yelling at him." Among other things, she said that she yelled at him, "it doesn't take my husband to be home to, you know, take care of things, because I'm not going to let [you] touch my children." Respondent then got on the phone and called the police; petitioner's mother could see him pointing at her and making what she described as a "jack off" motion while he was on the phone.

During the summer before the hearing, petitioner was outside shaking out some rugs when respondent pulled up the parties' shared driveway in a convertible car with the top down. When she noticed his car stop, petitioner looked

---

a predatory sex offender." The trial court excluded that evidence, stating, "[I]n order to submit a legal document in court you need a certified copy of the actual conviction." The flyer would have been relevant to establish that any alarm petitioner in fact experienced was objectively reasonable, regardless of the truth of the matter that it asserts. However, petitioner does not cross-assign error to that ruling, and accordingly we may not consider the flyer or petitioner's mother's report about what it contained.

over at him and saw that he was staring at her. She went inside to tell her father, and respondent drove away.

On another occasion about three months before the hearing, petitioner was waiting for the school bus in the driveway with some other children when respondent speeded down the driveway "doing like 35 miles an hour and he came like a hand's length away from hitting me."

On a fourth occasion, just after petitioner got her driver's license, petitioner was at the intersection of the driveway and the highway waiting to pull onto the highway. When she looked both ways, there were no cars, but when she began to pull out, respondent "had his Explorer in my lane, and I couldn't pull out until he went around me, and he almost took the front of my car off."

The most recent incident involved respondent following petitioner to school. Both petitioner and respondent gave an account of that incident,[3] as did a third witness. The three accounts agree in many respects, but differ in others.

According to petitioner, she was driving herself to school in her father's truck when she noticed respondent following her. She tried to speed up to get away from him, and then she pulled to the side of the road to let him pass, but he did not pass. At times he followed her so closely that she could not see his front bumper in her rearview mirror. Petitioner testified that "it frightened me. He is a frightening man to me * * *." When she reached school, she pulled into an empty parking lot and locked the doors of the truck. When respondent saw that petitioner had not come into the parking lot, she got out of the truck and saw him make a U-turn and "c[o]me at me again," at which point she got back into the truck and again locked the doors. Respondent then parked his truck next to the passenger side of petitioner's truck and, apparently, both of them sat in their vehicles until Whitmire,

---

[3] Respondent gave his account of this incident during his opening statement at the show cause hearing. When respondent took the stand, the trial court told him, "The statement that you made over here at that table was not evidence. If you want me to hear your side of what happened you have to tell me from there." However, in its ruling, the trial court expressly relied upon respondent's "testimony" about this incident during his opening statement. We accordingly consider respondent's account to be part of the record.

the school librarian, pulled into the parking lot. When she saw Whitmire, petitioner got out of her truck, told Whitmire that respondent was her neighbor, and—by petitioner's own description—"did go a little out of control [be]cause my temper did flare a little bit towards him." Respondent told her that he had thought that petitioner's father was driving the truck. Petitioner asked him "how could he come after a 16-year-old child," and he responded that he had never done anything to a child. Then petitioner called him a "child molester" and said, "Fuck you." Respondent replied that he would "get" petitioner's father. Petitioner then went inside the school building and called her mother. When questioned about how this incident made her feel, petitioner said, "Well, he should know how I felt, and—I—he did not—it didn't intimidate me, but it did frighten me because I know his background."

According to respondent, this incident closely followed, and was a response to, an incident in which petitioner's father had attacked respondent's nine-year-old daughter with a shovel.[4] When respondent pulled up behind petitioner's father's truck, he could not see who was inside because the windows are tinted. As the truck pulled out into traffic, the window was rolled down and "out comes a hand and flips me the bird." Because he believed petitioner's father was driving, respondent decided that he would follow him into town in order to explain that he found it unacceptable for petitioner's father to be aggressive toward respondent's family. He did not follow the truck into the parking lot at first because it was deserted and "I know there has to be witnesses." When he saw another car pulling into the parking lot and the truck's door opening, he turned his truck around into

---

[4] The record contains varying accounts of the shovel incident. According to petitioner's father, he was digging a ditch behind his house when one of his children told him that respondent and several members of his family were driving their "four tracks" on the common driveway. Petitioner's father testified that he had spent $14,000 and two and a half weeks of labor to put in the driveway and that the four tracks "tear [it] up." Petitioner's father walked to the fence where he saw respondent and a little girl on a four track. He asked respondent to "quit doing that kind of stuff." He still had a shovel in his hand, but testified that it "never left the ground" while he was talking to respondent. According to respondent and his wife, petitioner's father came running down the driveway "with the shovel above his head." Their nine-year-old daughter jumped off the four track and ran away crying; she then cried "hysterically" for 20 minutes.

the parking lot. When he saw that petitioner, not her father, was driving, his initial thought was to leave, but it then occurred to him that he should explain himself to Whitmire, who was now standing in the parking lot. He told Whitmire, "Sorry. I thought it was [petitioner's father]." Petitioner then began screaming, including calling respondent a "child molester." That made respondent angry, and he said to petitioner, "You tell him that if he ever comes after my nine-year-old again I will get him." Petitioner continued to yell at him, ending with the remarks quoted above. 204 Or App at 414.

Whitmire testified that, as soon as she pulled her car into the parking lot that day, petitioner was running toward her car screaming so "hysterically" that Whitmire could not understand what she was saying at first. When she understood that petitioner was saying that her neighbor had followed her to school, Whitmire still could not see respondent or his car until respondent pulled up to where they were standing. According to Whitmire, petitioner was "very upset" and yelled "pretty rude" things to respondent, who was still in his truck. Respondent then explained that he had not meant to follow petitioner to school and that he had thought that her father was driving the truck. Petitioner began screaming at respondent, including calling him a child molester, to which he responded, "I have never, ever molested any children," and then left. Petitioner then went inside the school building and called her mother.

In addition, petitioner's mother testified that respondent does "suspicious" things. She recounted an incident in which he drove up the shared driveway in a black car late at night and put a gym bag with what appeared to be a rope hanging out of it and a black garbage bag into his garage. She also stated that she has "caught him standing behind the trees" in his yard "look[ing] our way." About three and a half years before the hearing, "for two weeks straight," respondent would wait in his car about 300 feet from the school bus stop in the morning and in the afternoon when her children would be leaving for or coming home from school. Petitioner's mother also questioned her 16-year-old son about events on the morning of the hearing; the boy testified that the cars of the two families had passed going opposite directions in the driveway and respondent had "rolled down his

window and like yelled something at us, and stuck his head out and smiled the whole way down * * *." Another boy who apparently lives with petitioner's family also testified about that interaction. When petitioner's mother asked him if he felt threatened, the following colloquy occurred:

"A. I felt anger and threatened.

"* * * * *

"THE COURT: Why did you feel like you were in danger? Did he say something to threaten you?

"THE WITNESS: Just because I know his background, and it just makes me worry about things.

"THE COURT: And it's only because of his background is the reason that it causes you concern?

"THE WITNESS: Yes.

"* * * * *

"[PETITIONER'S MOTHER]: Does it have to do with his background of prior things or background with what he's— what has been going on at our home?

"A. About what's been going on at home."

At the close of the hearing, the trial court ruled as follows:

"[T]his is a very close case. It's close because there's— there's witnesses on each side, and your version of what happened or the intent behind it is very different.

"Nonetheless, * * * by a preponderance of the evidence I find in favor of the petitioner in this case. I find that there is * * * enough evidence to show that the respondent at least knowingly and recklessly engaged in repeated and unwanted contact with the person or that person's immediate family or household in this case, and that it is objectively reasonable for that person to have been alarmed by that contact.

"Now what I'm * * * basing this on is the fact that, one, he was certainly told they wanted no contact, and told repeatedly no contact, stay away from them. It was the incident with the car, which you testified to, and then there was the following her to the school. The vehicle went to the school. That's where it was going. And when I began to look

at those incidents, those kinds of conduct, contact, that's repeated contact in and of itself, and is sufficient. You certainly knew that any contact was unwanted by these people.

"And with what happened with the vehicle, the almost hitting her, the following and the waiting by the bus, that is certainly enough to do that."

As noted, respondent appeals.

To obtain an SPO, a petitioner must prove all the elements in ORS 30.866(1).[5] A petitioner must prove that the respondent intentionally, knowingly, or recklessly made "repeated and unwanted contact" with the petitioner or a member of the petitioner's immediate family or household, thereby causing the petitioner to be alarmed or coerced. ORS 30.866(1)(a). The contact may consist of, among other things, coming into a person's visual or physical presence, following the person, waiting outside the person's home or property, or speaking with the person by any means. ORS 163.730(3) (providing definition of "contact" for both the criminal and civil stalking statutes). The contact must have occurred within two years before the petitioner commences the stalking action. ORS 30.866(6). Additionally, it must be objectively reasonable for the petitioner to have been alarmed or coerced, as those terms are defined in ORS 163.730(1) and (2). ORS 30.866(1)(b). Finally, the contact must actually cause the petitioner reasonable apprehension regarding the petitioner's own personal safety or that of a member of the petitioner's immediate family or household. ORS 30.866(1)(c).

---

[5] ORS 30.866(1) provides:

"A person may bring a civil action in a circuit court for a court's stalking protective order or for damages, or both, against a person if:

"(a) The person intentionally, knowingly or recklessly engages in repeated and unwanted contact with the other person or a member of that person's immediate family or household thereby alarming or coercing the other person;

"(b) It is objectively reasonable for a person in the victim's situation to have been alarmed or coerced by the contact; and

"(c) The repeated and unwanted contact causes the victim reasonable apprehension regarding the personal safety of the victim or a member of the victim's immediate family or household."

■ Respondent argues that the evidence was insufficient in a number of respects to satisfy the elements of the stalking statute. Because it is dispositive, we address only his argument about the evidence of petitioner's subjective state of mind.

■ Under ORS 30.866(1)(c), a person seeking an SPO must establish that unwanted contacts had a certain subjective effect on him or her. "The contacted person must in fact be alarmed or coerced by the contacts, and the contacts must in fact cause the person apprehension regarding his or her personal safety." *Weatherly v. Wilkie*, 169 Or App 257, 259, 8 P3d 251 (2000). Because an SPO may issue only upon proof of "repeated" contacts, a petitioner must establish that at least two contacts caused her to be alarmed or coerced and to be apprehensive about her personal safety. *See* ORS 163.730(7) ("repeated" means two or more times). "Alarm" means "to cause apprehension or fear resulting from the perception of danger." ORS 163.730(1). "Coerce" means "to restrain, compel or dominate by force or threat." ORS 163.730(2).

The trial court did not expressly find that petitioner was actually alarmed or coerced by any contact with respondent. After reviewing the record *de novo*, we conclude that petitioner offered sufficient evidence about the subjective effect on her of respondent's conduct with respect to only one contact within the two-year period preceding the filing of the petition. Regarding the incident in which respondent followed her as she drove to school in her father's truck, petitioner testified that "it frightened me. He is a frightening man to me * * *," and that "it didn't intimidate me, but it did frighten me because I know his background." Although the alarm must arise from the contact, it is permissible, in assessing the subjective effect of a particular contact, to consider the context of the contact. Here, petitioner's statement that she knew of respondent's background supports findings that petitioner was actually alarmed or coerced by that contact and that that contact caused her apprehension for her personal safety. Even though petitioner proved that she was "alarmed" by that incident, the record simply does not contain any sufficient evidence of petitioner's alarm or apprehension with respect to any other contact in the relevant time period.

Besides the testimony quoted, the only evidence in the record relevant to the effect that respondent's conduct had on petitioner was offered by petitioner's mother. Petitioner's mother testified that, for four years, her children have been "crying, upset, [and] scared" of respondent. She also testified that, after the children noticed respondent watching them in the bushes, they were "very upset." Although we do not doubt that petitioner and her family have experienced distress, we are limited in our review to the information in the record before us. Although petitioner may have been apprehensive for her safety during some of these other contacts, the statute requires that, in order for the court to issue a stalking protective order, the petitioner must prove that the contact caused her to experience "alarm," that is, that she felt apprehension or fear resulting from the perception of danger. We considered a similar question in *Cress v. Cress*, 175 Or App 599, 601, 29 P3d 1169 (2001), in which, although the petitioner was tearful and extremely upset after contact with the respondent, she identified no apprehension relating to her own or anyone else's personal safety, and we accordingly reversed the SPO. As we explained in *Cress*:

> "The contacts must cause alarm or coerce her, and they must cause her apprehension about her personal safety or that of a family member. Moreover, her reaction to the contacts must be objectively reasonable. * * * Petitioner did not identify any apprehension relating to her or anyone else's personal safety. * * * [S]he did not even describe herself as concerned in some general or nonspecific way about her or someone else's personal safety."

*Id.* at 601 (footnote omitted). We find *in this record* no evidence that any contacts other than the incident ending in the school parking lot caused petitioner apprehension for her personal safety. Neither petitioner herself nor her mother testified with regard to any of the other incidents that petitioner was apprehensive about her personal safety.

We have indicated that it sometimes may be possible to infer subjective alarm or coercion in a stalking case. *Boyd v. Essin*, 170 Or App 509, 517-18, 12 P3d 1003 (2000), *rev den*, 331 Or 674 (2001). In this case, however, unlike in *Boyd*, the nature of the contacts and the history of the relationship between respondent and petitioner and her family do not give

rise to such an inference. In particular, in *Boyd*, the respondent had assaulted one of the parties' children, and the petitioner was aware of that. The respondent also had previously threatened the petitioner with a gun and a baseball bat. We explained in *Boyd* that we would infer the petitioner's alarm in view of the nature of the respondent's contacts and his history of assaultive behavior towards the petitioner. *Id.* In this case, there is no evidence of any direct threats or assaultive behavior that would allow us to infer the degree of fear and apprehension necessary to satisfy the statutory requirements. Moreover, considering the record as a whole, we note that this stalking proceeding is the culmination of a long-standing pattern of acrimony between the two families. In particular, there is evidence that petitioner and her family members at some points have acted in an aggressive manner toward respondent that would be more consistent with anger than with fear regarding their personal safety. We do not mean to suggest that there may not be situations in which those emotions coexist; here, however, the record simply does not include sufficient evidence of the alarm and fear for personal safety that the stalking statute requires.

Our conclusion that the evidence in the record does not meet the statutory requirements is not merely a technical concern. The issuance of an SPO is a serious matter, and the statutory requirements imposed by the legislature are clearly designed to ensure that such orders are imposed only when the need for such an order is clearly established.

Because we conclude that the SPO should not have been issued, we do not reach petitioner's second assignment of error regarding the scope of the SPO.

Reversed.