Argued and submitted September 27, 2010, reversed May 2, 2012

Sally Ann BROWN,
*Petitioner-Respondent,*

*v.*

Emmy M. ROACH,
*Respondent-Appellant.*

Clatsop County Circuit Court
085168; A142587

277 P3d 628

Philip F. Schuster, II, argued the cause for appellant. With him on the briefs was Dierking & Schuster.

Richard S. White argued the cause and filed the brief for respondent.

Before Armstrong, Presiding Judge, and Haselton, Chief Judge, and Duncan, Judge.

DUNCAN, J.

## DUNCAN, J.

Pursuant to ORS 30.866, petitioner sought and obtained a stalking protective order (SPO) against respondent, her neighbor.[1] Respondent appeals, arguing that the court erred in concluding that she engaged in repeated, unwanted contacts that caused petitioner subjective and objectively reasonable alarm and coercion, as required under ORS 30.866. We conclude that the record establishes, at most, one qualifying contact within the meaning of ORS 30.866. Therefore, we reverse.

Because the notice of appeal in this case was filed after June 4, 2009, the effective date of the 2009 amendments to ORS 19.415, we do not review *de novo* unless we exercise our discretion to do so. *See* Or Laws 2009, ch 231, §§ 2, 3. Respondent invites us to review the facts *de novo* under ORS 19.415 because, she asserts, the evidence was legally insufficient to support the trial court's legal conclusions. Because that is an issue of law, we need not review the facts *de novo* in order to address it. *See, e.g., Travis v. Strubel*, 238 Or App 254, 256, 242 P3d 690 (2010). Therefore, we decline respondent's invitation to review *de novo*.

Rather, we review "the facts for any evidence and the legal conclusions based on those facts for errors of law." *Id.* "[O]ur task is to review the facts found by the [trial] court to determine whether they are supported by any evidence, and then to determine whether, as a matter of law, those facts together with facts implicitly found by the [trial] court, provide a basis" for issuance of an SPO under ORS 30.866. *Dept. of Human Services v. C. Z.*, 236 Or App 436, 442, 236 P3d 791 (2010) (so explaining in the context of a juvenile dependency case).

We state the facts consistently with that standard. The parties are neighbors and the relevant events took place in the course of a dispute regarding the location of their shared property line. In the fall of 2008, petitioner, her husband, her son, and her son's fiancée (collectively, the Browns)

---

[1] At the same hearing, the court heard evidence on a petition by petitioner's son's fiancée for an SPO against respondent's husband. The court denied that request, and that ruling is not at issue on appeal.

began to remodel the fourplex on petitioner's property. After they started work, respondent called the city several times to complain that the Browns were working without proper permits, and several stop-work orders were issued. The Browns cooperated with the city to resolve the permitting issues. As the Browns continued their project, sometimes working near the parties' shared property line, the parties' relationship became confrontational. Respondent asserted that, when doing their work, the Browns were causing drainage problems on her property and trespassing on her property. Over time, the confrontations escalated. Eventually, when they saw each other, respondent would yell and swear at the Browns. At some point, respondent also sent National Rifle Association membership information to petitioner.

In late October, the Browns commissioned a survey, which showed that respondent's property ended approximately 18 inches closer to her house than was indicated by the then-existing fence (which the parties agree belonged to respondent) and the existing retaining wall between the properties. Petitioner sent a copy of the survey to respondent.

Another incident took place in November, when petitioner and her son's fiancée crossed the historical property line, which was marked by a gate and a retaining wall, to place a stake at the newly surveyed corner of petitioner's property. Respondent and her husband ran up to them aggressively, threatening to sue petitioner. Respondent was clearly angry; her fists were clenched, and there was "fury in her eyes." Respondent yelled names and obscenities at petitioner. She also said, "We know what to do with your type."

On the morning of December 30, 2008, a truck that the Browns were driving became stuck on city property abutting their back yard. Respondent, who could see the scene from her house, called the police. Respondent knew that the Browns intended to remove her fence that day, and the parties discussed the fence with the police officer who responded to the call, Halverson. Respondent told Halverson that her attorney was in the process of filing a court action to prevent the removal of her fence. In light of the legal situation, Halverson told petitioner to speak to her attorney before removing respondent's fence.

An hour later, the Browns began to remove respondent's fence. As the Browns approached the fence, respondent sprayed them with water from her garden hose. She also yelled insults and obscenities. After respondent began spraying, petitioner's son put on rain gear and continued removing the fence. Petitioner's husband sprayed spray paint back over the fence toward respondent, and petitioner's son spat at respondent. Respondent called the police again, and Halverson responded. Respondent continued spraying the Browns until Halverson turned off the water supplying the hose.

At that point respondent went to her greenhouse, followed by Halverson. She picked up a garden implement that the trial court identified as an "axe or hoe." Halverson instructed her to put it down, which she did, and he then arrested her for harassment. He also instructed another officer to charge petitioner's husband and son with harassment.

The next morning another confrontation occurred. Petitioner was the passenger in a van parked in front of respondent's house. As petitioner got out of the vehicle, she saw respondent standing on respondent's front porch pointing a gun at her. She ran into the fourplex and called the police.

Petitioner filed her petition, and the trial court issued a temporary SPO. After a hearing, the trial court issued a permanent SPO, concluding that "[petitioner] and members of her family were alarmed and coerced by both the speech-based and the action-based contacts presented by [respondent]" and "all of the statutory elements have been met." Respondent appeals, arguing, *inter alia*, that the evidence was legally insufficient to support the trial court's conclusion that she engaged in repeated and unwanted contacts that caused petitioner objectively reasonable alarm or coercion.

The trial court issued the SPO under ORS 30.866, which provides, in part:

"(1)   A person may bring a civil action in a circuit court for a court's stalking protective order or for damages, or both, against a person if:

"(a) The person intentionally, knowingly or recklessly engages in repeated and unwanted contact with the other person or a member of that person's immediate family or household thereby alarming or coercing the other person;

"(b) It is objectively reasonable for a person in the victim's situation to have been alarmed or coerced by the contact; and

"(c) The repeated and unwanted contact causes the victim reasonable apprehension regarding the personal safety of the victim or a member of the victim's immediate family or household."

In order for an SPO to issue, a petitioner must show, by a preponderance of the evidence, intentional, knowing, or reckless conduct by the respondent against the petitioner or "a member of [her] immediate family or household" that constitutes "repeated and unwanted contact." ORS 30.866(1)(a). " 'Repeated' means two or more times." ORS 163.730(7). "Contact" includes, among other things, "[c]oming into the visual or physical presence of the other person," "[f]ollowing the other person," and "[s]peaking with the other person by any means." ORS 163.730(3).

In addition to conduct by the respondent that amounts to at least two unwanted "contacts," a petitioner must show that he or she was subjectively "alarmed" or "coerced" by each contact and that the alarm or coercion was objectively reasonable for "a person in the victim's situation." ORS 30.866(1)(a), (b); *Bryant v. Walker*, 190 Or App 253, 256, 78 P3d 148 (2003), *rev dismissed*, 337 Or 585 (2004). " 'Alarm' means to cause apprehension or fear resulting from the perception of danger." ORS 163.730(1). " 'Coerce' means to restrain, compel or dominate by force or threat." ORS 163.730(2).

Finally, the petitioner must show that "the contacts, cumulatively, caused her reasonably to fear for her personal safety." *Bryant*, 190 Or App at 256; ORS 30.866(1)(c).

If the respondent's conduct involves speech, Article I, section 8, of the Oregon Constitution requires the petitioner to prove that it is a "threat," as specified in *State v.*

*Rangel*, 328 Or 294, 303, 977 P2d 379 (1999), that is, "a communication that instills in the addressee a fear of imminent and serious personal violence from the speaker, is unequivocal, and is objectively likely to be followed by unlawful acts." A *Rangel* threat does not include "the kind of hyperbole, rhetorical excesses, and impotent expressions of anger or frustration that in some contexts can be privileged even if they alarm the addressee." *Id.* (internal quotation marks omitted). Although speech that is not a threat cannot be a "contact," it can provide context for nonexpressive contacts. *Habrat v. Milligan*, 208 Or App 229, 237, 145 P3d 180 (2006).

Under our standard of review, we must determine whether the evidence was legally sufficient to support the trial court's conclusion that two or more qualifying "contacts" took place. The court did not specify on which incidents it relied to find at least two "contacts." Rather, as mentioned, it found that "[petitioner] and members of her family were alarmed and coerced by both the speech-based and the action-based contacts presented by [respondent.]"

We consider the parties' interactions in three episodes. First we consider the incidents that took place before December 30, the day the Browns removed respondent's fence; all of those incidents were speech based. Then we consider the events surrounding the removal of the fence. Because we conclude that none of the parties' interactions up to that point was an actionable "contact," we do not consider the third episode, namely, the gun incident. Assuming that that incident was an actionable "contact," it was only one, and at least two are required.[2] Therefore, we reverse.

We first conclude that none of the interactions between respondent and the Browns that took place before December 30, all of which were speech based, constitutes a "threat" under *Rangel*.[3] As mentioned, under *Rangel*, in

---

[2] Petitioner argues that two incidents that took place after the temporary SPO was in place were also actionable "contacts." With regard to one of those, involving service of a temporary restraining order, the record does not reflect that petitioner was subjectively alarmed or coerced by it. As to the other, an occasion on which respondent shouted obscenities from inside her house, it does not meet the standard required of speech-based "contacts" explained in *Rangel*, as is evident from the discussion of *Rangel* below.

[3] To the extent that those incidents involved nonspeech conduct separable from respondent's speech—and particularly with regard to respondent's conduct

order for speech to constitute a qualifying contact to support the issuance of an SPO, the speech must be a "threat," specifically, "a communication that instills in the addressee a fear of imminent and serious personal violence from the speaker, is unequivocal, and is objectively likely to be followed by unlawful acts." 328 Or at 303. Thus, as we have repeatedly held, offensive, hostile, and aggressive statements are not enough to satisfy the standard, nor are equivocal threats or threats that are not objectively likely to be acted upon. *See, e.g., Gunther v. Robinson,* 240 Or App 525, 530, 248 P3d 20 (2011) (the respondent's act of shouting "heil Hitler" at the petitioner, her neighbor, was insufficient to meet the *Rangel* standard); *Swarringim v. Olson,* 234 Or App 309, 314-15, 227 P3d 818 (2010) (the respondent's statements that he would have someone beat up the petitioner's son or slit his throat and his cursing at the petitioner's nine-year-old daughter while she walked home from school were insufficient to meet the *Rangel* standard); *Goodness v. Beckham,* 224 Or App 565, 577-78, 198 P3d 980 (2008) (the respondent's repeated e-mails to the petitioner, including many insults, profanities, and threats that "you're going to pay" and "I can get you where you need to be behind bars" were insufficient to meet the *Rangel* standard (brackets omitted)). Petitioner asserts that the numerous offensive and hostile statements that respondent directed toward her—which included insults and obscenities and the statement, "We know what to do with your type"—are "threats" under *Rangel.* However, as the cases cited above demonstrate, the statements do not satisfy the *Rangel* standard.

Next, we turn to the day on which the Browns removed respondent's fence. Petitioner asserts that respondent's conduct that day constitutes two separate "contacts." Assuming, without deciding, that two "contacts" could occur during a single morning in which the parties interacted more or less continuously for several hours, we evaluate each of respondent's acts on which petitioner relies and conclude that neither is a "contact."

during the November incident, when she ran up to petitioner after petitioner crossed the historical property line—in accordance with the discussion below, 249 Or App at 586-88, we conclude that respondent's nonspeech conduct did not give rise to objectively reasonable "alarm." ORS 30.866(1)(b).

Petitioner argues that respondent's act of going to the greenhouse and picking up the axe or hoe was a "contact" with petitioner separate from the parties' ongoing interaction regarding the fence. However, the record does not demonstrate, and the trial court did not find, that that incident alarmed or coerced petitioner or even that petitioner knew of it. Petitioner did not testify as to when—or whether—she learned of the incident or what her reaction was. *See Farris v. Johnson,* 222 Or App 377, 382-83, 193 P3d 66 (2008) (the respondent's interaction with the petitioner's husband was not a "contact" where the record did not indicate that the petitioner had been made aware of the incident or alarmed by it). Thus, we conclude that that incident was not an actionable "contact."

Petitioner also argues that respondent "contacted" her and her family members on that day by spraying them with her hose while they removed respondent's fence. Petitioner was subjectively alarmed by the spraying. Thus, we consider whether it was objectively reasonable for a person in petitioner's situation to be "alarmed," within the meaning of ORS 163.730(1).[4]

As mentioned, "alarm" is "apprehension or fear resulting from the perception of danger." ORS 163.730(1). We understand "danger," as used in ORS 163.730(1), to refer to a threat of physical injury, not merely a threat of annoyance or harassment. *Reitz v. Erazo,* 248 Or App 700, 707, 274 P3d 214 (2012); *see also Webster's Third New Int'l Dictionary* 573 (unabridged ed 2002) (defining "danger" as "the state of being exposed to harm : liability to injury, pain, or loss"). We conclude that, while respondent's act of spraying the Browns with the hose while they attempted to remove her fence may have been annoying and harassing, it did not give rise to an objectively reasonable apprehension or fear of physical injury, either at the time of the spraying or in the future.

---

[4] ORS 30.866(1) requires the petitioner to be subjectively alarmed or coerced and that alarm or coercion to be objectively reasonable. As to coercion, petitioner did not testify, and no evidence in the record indicates, that she was subjectively coerced by the spraying. *See* ORS 163.730(2) (" 'Coerce' means to restrain, compel or dominate by force or threat."). Therefore, we do not evaluate whether the circumstances would have given rise to objectively reasonable coercion.

First, the spraying did not give rise to an objectively reasonable apprehension or fear of physical injury at the time. Simply put, respondent's act of spraying the Browns with water did not endanger them. Indeed, the responses of both the Browns and Halverson to the spraying indicate that the spraying was annoying and harassing, but not dangerous. When respondent sprayed the Browns, petitioner's son put on rain gear and continued removing respondent's fence, and Halverson arrested respondent for harassment—the same crime with which he told the other officer to charge petitioner's husband and son—not attempted assault. *Compare* ORS 166.065(1)(a)(A) ("A person commits the crime of harassment if the person intentionally * * * [h]arasses or annoys another person by * * * [s]ubjecting such other person to offensive physical contact."), *with* ORS 163.160(1)(a) ("A person commits the crime of assault in the fourth degree if the person * * * [i]ntentionally, knowingly or recklessly causes physical injury to another."). The record contains no evidence from which one could conclude, without speculating, that respondent's act of spraying the Browns was likely to cause physical injury.

Second, the spraying did not give rise to an objectively reasonable apprehension or fear of physical injury in the future. Petitioner argues that the spraying was so outrageous that it demonstrated that respondent was likely to injure her or her family in the future. In making that argument, however, petitioner erroneously discounts the context of the spraying.

ORS 30.866(1)(b) requires a court to evaluate whether "[i]t is objectively reasonable for a person in the victim's situation to have been alarmed or coerced" by the respondent's contact. The victim's situation includes all of the circumstances of the parties' relationship. The fact that some of those circumstances may be legal in nature does not exclude them from the court's consideration. *See, e.g., Magyar v. Weinstein*, 211 Or App 86, 90-92, 153 P3d 135 (2007) (noting the parties' joint ownership of the property where the incidents at issue took place in evaluating whether the petitioner's fear for his personal safety was reasonable); *Bryant*, 190 Or App at 256-57 (considering the petitioner's

knowledge of the respondent's ex-wife's petition for a restraining order against him in determining whether her alarm was reasonable). Consequently, the property dispute, and the status of the parties' actions under statutes relevant to the dispute, is relevant to the objective reasonableness of petitioner's alarm.

In support of her argument that the spraying demonstrated that respondent was out of control and, therefore, dangerous, petitioner argues that respondent had no reason to spray the Browns. That premise is faulty. The Browns' conduct—removing petitioner's fence less than one year after respondent discovered that it was on disputed property—was unlawful. ORS 96.060(2) ("The occupant or owner of land whereon a fence has been built by mistake shall not throw down or in any manner disturb such fence during [one year after the person who built the fence discovers that it is not on his or her property].". In response to that unlawful conduct, respondent could use physical force to protect her property to the extent that she reasonably believed such force was necessary. *See* ORS 161.229 ("A person is justified in using physical force, other than deadly physical force, upon another person when and to the extent that the person reasonably believes it to be necessary to prevent or terminate the commission or attempted commission by the other person of theft or criminal mischief of property."); ORS 161.190. Thus, contrary to petitioner's claim, respondent had a reason—indeed, a legal right—to use reasonable force to respond to the removal of her fence.

Viewed in light of the property dispute and the Browns' behavior, respondent's behavior was not inexplicable or unjustified. Furthermore, although respondent was extremely angry with petitioner, she did not cross the property line; all of her actions were aimed toward defending her property against the Browns. In short, respondent sprayed the Browns in an attempt to stop them from removing her fence. Nothing about the incident indicated that she was dangerous to the Browns while she sprayed them or that she would be dangerous to them in the future, when they were

not attempting to remove her fence.[5] Accordingly, the spraying incident is not a qualifying contact.[6]

Because the gun incident is the only remaining possible contact and two or more "contacts" are required, there was insufficient evidence to support the issuance of the SPO.[7]

Reversed.

---

[5] As noted above, 249 Or App at 584 n 3, the same analysis applies to respondent's nonspeech conduct during the November incident, which consisted of running up to petitioner when petitioner crossed the historical property line to place a stake on the disputed property.

[6] We are mindful of the difficult relationship between the parties, which is obviously stressful to them. Our conclusion that the evidence in this case does not satisfy the statutory requirements for issuance of an SPO is "not merely a technical concern." *Soderholm v. Krueger*, 204 Or App 409, 420, 129 P3d 764 (2006). "The issuance of an SPO is a serious matter, and the statutory requirements imposed by the legislature are clearly designed to ensure that such orders are imposed only when the need for such an order is clearly established." *Id.* Although we recognize petitioner's desire to be separated from respondent, on this record, an SPO is not an available means to achieve that separation.

[7] Because we conclude that the trial court erred in issuing the SPO, we do not address respondent's alternative argument that we should limit the scope of the SPO to permit her to use her property without violating the order.