Argued and submitted September 25, 2012, judgment in A149922 reversed and remanded; judgment in A149923 affirmed February 20, 2014.

David Wayne CHRISTENSEN,
*Petitioner-Appellant,*

*v.*

Breck CARTER,
*Respondent-Respondent.*

David Wayne CHRISTENSEN,
*Petitioner-Appellant,*

*v.*

Robert Maurice BOSKET,
*Respondent-Respondent.*

Washington County Circuit Court
C114699CV, C114700CV;
A149922 (Control), A149923

323 P3d 348

Jessica A. Skelton argued the cause for appellant. With her on the brief was Legal Voice.

No appearance for respondent Breck Carter.

No appearance for respondent Robert Bosket.

Before Ortega, Presiding Judge, and Sercombe, Judge, and Hadlock, Judge.

ORTEGA, P. J.

## ORTEGA, P. J.

In this consolidated appeal, petitioner appeals judgments dismissing his petitions for permanent stalking protective orders (SPOs) against two of his neighbors, Bosket and Carter, under ORS 30.866.[1] Petitioner contends that the trial court erred in determining that it was not objectively reasonable for a person in his situation to have been alarmed and that he failed to establish two qualifying contacts for each respondent. As for Bosket, we agree with the trial court that petitioner failed to establish two qualifying contacts. However, as for Carter, we conclude that there were sufficient contacts to support the issuance of an SPO. Accordingly, we affirm the judgment dismissing the SPO petition against Bosket, and we reverse the judgment dismissing the SPO petition against Carter.

On appeal, petitioner seeks *de novo* review because, he asserts, the trial court improperly created a "categorical exemption for disputes between neighbors" and relied on that exemption when evaluating the facts in the record. However, because petitioner's argument raises an issue of law and this is not otherwise an "exceptional case" justifying *de novo* review, we review the trial court's factual findings for "any evidence" and its legal conclusions for errors of law. *See* ORAP 5.40(8)(c); *Brown v. Roach*, 249 Or App 579, 580, 277 P3d 628 (2012).

As in other equitable proceedings, "we view the evidence, as supplemented and buttressed by permissible derivative inferences, in the light most favorable to the trial court's disposition and assess whether, when so viewed, the record was legally sufficient to permit that outcome." *Dept. of Human Services v. N. P.*, 257 Or App 633, 639, 307 P3d 444 (2013) (stating our standard of review in juvenile dependency cases). We state the facts consistently with that standard.

In the spring of 2010, petitioner moved into a condominium with his domestic partner, Kirk. Their condominium

---

[1] Petitioner sought two different permanent SPOs, one against each of his neighbors. Because the events leading up to the petitions for the SPOs were intertwined, the trial court held a consolidated hearing.

is located next to, and shares a wall with, Bosket's unit. Carter's condominium is located on the other side of Bosket's unit. In the summer of 2011, petitioner became involved with the homeowner's association (HOA) and was appointed to serve as facilities chairman. In that capacity, he oversaw a number of maintenance projects in the complex. Prior to taking that position, his relationship with both neighbors was cordial; however, after he became facilities chairman, the relationships became strained and disagreements about various maintenance projects led to several of the contacts at issue.

## I. INCIDENTS WITH RESPONDENT BOCKET

The first incident occurred on July 28, 2011. Bosket erected a large garage sale sign in his front yard and petitioner asked him if he had sought the necessary HOA consent to display the sign. Bosket became "very agitated and very angry, got red in the face and started yelling" at petitioner about the "damned [HOA] board." Trying to avoid a confrontation, petitioner returned to his residence, but Bosket followed him and continued to yell and angrily shake his clenched fists at petitioner. As petitioner stood at the top of his front stairs about to enter his unit, Bosket yelled, "Come down here, motherfucker, and I'll show you." Later that afternoon, Bosket apologized to petitioner, and a few days later both petitioner and Bosket participated in a previously arranged HOA work party without incident.

A second incident occurred on August 16, a few days after an HOA-approved tree trimming had occurred at the condominium complex. That night, Bosket knocked on petitioner's door and, as soon as petitioner opened the door, forcibly entered, punched petitioner in the chest, pushed him backwards onto the stairs, and wrapped his hands around his neck. As he choked petitioner, Bosket yelled at him for cutting his trees and addressed him using homophobic slurs. Carter, who was standing outside, told Bosket, "They're going to pay for what they've done, they get it, come down from there." Eventually, Bosket's girlfriend and Carter convinced Bosket to leave. After he left, petitioner called the police, who then arrested Bosket.

## II.  INCIDENTS WITH RESPONDENT CARTER

Several incidents involving Carter occurred in between the two incidents involving Bosket. On July 31, Carter accused petitioner and Kirk of getting paint on his truck while they were working on an HOA fence painting project. Carter "came out of his garage at a very rapid rate, very aggressively, stormed up to Kirk and started yelling at him" about the paint. Carter clenched his fists violently, leading petitioner to believe that Carter would hit Kirk. Petitioner tried to diffuse the situation, but Carter verbally attacked the couple, calling them "fucking faggots and homos" and stating that he "didn't like having queers living next door to him." When petitioner started to walk away, Carter accused him of "walking away like a little girl fag." The parties' relationship continued to be confrontational, and several days later Carter again swore at petitioner using homophobic slurs.

On August 10, Carter, who was standing outside his unit, told petitioner that "he was tired of []fucking queers fucking up his homeowners association." Later that evening, Carter was biking on the sidewalk; when he saw petitioner walking there, he "stood up on his pedals and started accelerating toward [petitioner]." In order to avoid being hit, petitioner had to "jump off the sidewalk."

On August 12, HOA-contracted tree trimmers arrived outside of Carter's unit. Because Carter believed that he was not given proper notice of the project, he yelled at the workers and petitioner. Later that morning, Carter approached petitioner, who was standing in his carport, and started complaining about the HOA and the tree trimming. He was "very angry and very agitated." In a "menacing [] tone[,]" he told petitioner, "When I'm done, you [and Kirk] will be off the [HOA] board * * * by Sunday or you'll be dead." After this encounter, petitioner told the chairman of the HOA board of Carter's threat and, based on the chairman's advice, filed a report with the police, who later interviewed Carter.

On August 14, as petitioner walked past Carter's unit on his way to the HOA board meeting, Carter said, "I hope you're ready for this meeting because when I'm done

with you, you're going to be off the fucking board. I want you—you queers are going to be out of my neighborhood."

Two days after Bosket's attack on petitioner, on August 18, petitioner and Kirk went to a victim's assistance center to obtain an SPO against Bosket and Carter. As they were returning to the complex in their car, they encountered Carter standing outside his condominium. When Carter saw them, he shook his fist at them and started yelling. As petitioner and Kirk got out of their car in their carport, Carter walked over to the edge of their carport and yelled at them, with clenched fists, "I can't believe that you—that you called the police, you fucking pansy queer. You better watch your back."

At trial, petitioner expressed alarm that Carter had "this habit of just suddenly appearing" when petitioner was out in front of his house "or doing something, like going to check the mail." Petitioner explained that "it's happened so often that it's *** like he's laying [sic] in wait *** frankly, it scares the crap out of me sometimes because [Carter] just appears out of nowhere."

After a consolidated hearing, the trial court credited petitioner's and Kirk's testimony, and determined that petitioner had met the subjective requirement of ORS 30.866(1). However, the court denied the petitions because it concluded that petitioner had failed to show, for either petition, that there were two "contacts" that would satisfy the element of objectively reasonable alarm in ORS 30.866(1). Regarding Bosket, the court determined that there was only one qualifying contact—the strangling incident. The court explained that the initial contact—the July 28 confrontation about the garage sale sign—was "purely communicative" and was not "a threat of imminent serious personal violence" to petitioner as required by *State v. Rangel*, 328 Or 294, 303, 977 P2d 379 (1999). As for Carter, the court determined that most of the contacts were expressive and that, although what Carter expressed was offensive, there was no objectively reasonable basis for petitioner to believe that he would *actually* be harmed. As a result, the trial court dismissed the petitions.

On appeal, petitioner assigns error to the trial court's denial of his petitions. He challenges several aspects of the

court's ruling, arguing that the trial court erred by creating a "categorical exemption for disputes between neighbors" which led to its conclusion that neither Carter's repeated contacts and threats, nor Bosket's direct threat and physical attack, caused objectively reasonable alarm. Petitioner also contends that the trial court erred in deciding that there was insufficient evidence of two qualifying contacts for each respondent and that the court disregarded the homophobic nature of the unwanted contacts when deciding that petitioner's alarm was not objectively reasonable.

ORS 30.866(1) provides:

"A person may bring a civil action in a circuit court for a court's stalking protective order or for damages, or both, against a person if:

"(a)   The person intentionally, knowingly or recklessly engages in repeated and unwanted contact with the other person or a member of that person's immediate family or household thereby alarming or coercing the other person;

"(b)   It is objectively reasonable for a person in the victim's situation to have been alarmed or coerced by the contact; and

"(c)   The repeated and unwanted contact causes the victim reasonable apprehension regarding the personal safety of the victim or a member of the victim's immediate family or household."

That statute requires that a petitioner demonstrate that there were two or more unwanted contacts with either the petitioner or a member of the petitioner's immediate family within the previous two years. *Swarringim v. Olson*, 234 Or App 309, 312, 277 P3d 818 (2010) (citing ORS 30.866(6); ORS 163.730(7) (providing definition of "repeated" for ORS 30.866)). "[E]ach contact must give rise to subjective alarm and that alarm must be objectively reasonable * * *." *Blastic v. Holm*, 248 Or App 414, 418, 273 P3d 304 (2012). "Alarm," for purposes of the issuance of an SPO, means "to cause apprehension or fear resulting from the perception of danger." ORS 163.730(1). "[T]he contacts, cumulatively, [also] must give rise to subjective apprehension regarding the petitioner's personal safety or the personal safety of a member of the petitioner's immediate family or household, and

that apprehension must be objectively reasonable." *Blastic*, 248 Or App at 418.

A "contact" includes almost any interaction with the petitioner and can be divided between nonexpressive contacts and expressive, also known as communicative, contacts. *See* ORS 163.730(3) (defining "contact"). Nonexpressive contacts are physical, such as "coming into the visual or physical presence of the other person" or "committing a crime against the other person." *Goodness v. Beckham*, 224 Or App 565, 574, 198 P3d 980 (2008) (quoting ORS 163.730(3)). Expressive contacts are those that involve speech, either oral or written. Constitutional problems may arise when the petitioner relies on contacts that involve expression. Under Article I, section 8, of the Oregon Constitution, in order to avoid constitutional overbreadth problems, expressive conduct is only punishable if it is a threat. Under *Rangel*, a "threat" is "a communication that instills in the addressee a fear of imminent and serious personal violence from the speaker, is unequivocal, and is objectively likely to be followed by unlawful acts." 328 Or at 303. Qualifying threats do not include "'the kind of hyperbole, rhetorical excesses, and impotent expressions of anger or frustration that in some contexts can be privileged even if they alarm the addressee.'" *Id.* at 304 (quoting *State v. Moyle*, 299 Or 691, 705, 705 P2d 740 (1985)). "However, the fact that speech cannot serve as a 'contact' in itself does not prohibit a court from considering it. Speech that does not meet the *Rangel* standard can provide 'relevant context for *** nonexpressive contacts.'" *Blastic*, 248 Or App at 419 (citing *Habrat v. Milligan,* 208 Or App 229, 237, 145 P3d 180 (2006)).

When the petitioner relies on a contact that includes *both* expressive and nonexpressive conduct, the analysis of whether a contact qualifies under ORS 30.866 depends on which act causes the alarm or coercion against which the statute offers protection. If the act causing the alarm or coercion is the expressive conduct, then that expression must meet the standard of a qualifying threat under *Rangel*. However, where the act that causes alarm or coercion is based on the nonexpressive conduct, the less stringent statutory standard applies. *See, e.g., Brown*, 249 Or App at 584 n 3 (concluding that the "nonspeech conduct" that was separable

from the respondent's speech did not give rise to objectively reasonable "alarm"); *Castro v. Heinzman*, 194 Or App 7, 15, 92 P3d 758 (2004) (reasoning that physically approaching the petitioner was a nonexpressive contact even though the respondent also spoke, because the encounter was not "purely expressive"); *State v. Sierzega*, 236 Or App 630, 637, 237 P3d 234 (2010) (finding that a face-to-face contact was "not purely communicative so as to import the additional requirement of *** *Rangel*" even though the respondent spoke). If the expressive conduct does not qualify as a threat under *Rangel*, that communication can still provide relevant context for the nonexpressive contact. *See Blastic*, 248 Or App at 419; *Habrat*, 208 Or App at 237; *Castro*, 194 Or App at 14.

Initially, we reject petitioner's contention that the trial court created an exemption from SPOs for disputes between neighbors.[2] In previous cases we have explained that it is often necessary to view contacts in context in order to determine whether they give rise to objectively reasonable alarm. *See Weatherly v. Wilkie*, 169 Or App 257, 263, 8 P3d 251 (2000) (explaining that contacts might appear innocuous when viewed in isolation but, when viewed in context, may take on a different character). Here, the trial court considered the context in which the disputes took place—that is, disagreements about "trees, the paint, the projects, [and] the dynamics of the HOA"—to determine whether it would be objectively reasonable for a person in petitioner's situation to be alarmed by each contact; it did not create a broad exemption from SPOs for all disputes between neighbors.

Next, we address the court's determination that there were not two qualifying contacts with either respondent that caused objectively reasonable alarm. We agree with the trial court that only one contact between petitioner and Bosket constituted a qualifying contact; accordingly,

---

[2] Specifically, petitioner relies on the following statement by the trial court:

"[A]ll of the [encounters] revolve around a dispute that's a neighborhood—not about, you know, parties that were in a personal relationship, not out of a break-up and heartache, which we all know can escalate into things that are twisted, not out of the, you know, ex-wife or the ex-husband, but things that revolve around the trees, the paint, the projects, the dynamics of the HOA."

we affirm the denial of that petition. However, as to Carter, we conclude that there was sufficient evidence of at least two nonexpressive contacts in the record that could have caused alarm that would meet the statutory requirement of objective reasonableness. Therefore, we conclude that the trial court erred in denying the issuance of the SPO against Carter.

We first address Bosket's interactions with petitioner and conclude that only the second of those interactions—the strangling incident—constituted a qualifying "contact" under ORS 30.866(1). The first interaction—the July 28 confrontation regarding the garage sale sign—involved expressive conduct that did not constitute a "threat" under *Rangel* and, consequently, was not a qualifying contact for purposes of ORS 30.866. "[W]e have repeatedly held [that] offensive, hostile, and aggressive statements are not enough to satisfy the standard, nor are equivocal threats or threats that are not objectively likely to be acted upon." *Brown*, 249 Or App at 585 (concluding that the respondent's offensive and hostile statements, including the statement, "We know what to do with your type[,]" were insufficient to meet the *Rangel* standard); *see, e.g., State v. Jackson*, 259 Or App 248, 250-51, 313 P3d 383 (2013) (the defendant's attempt to "lure" the alleged victim into a fight by yelling profanities did not constitute a threat under *Rangel*); *Goodness*, 224 Or App at 577-78 (the respondent's repeated e-mails to the petitioner, including profanities and threats that "I'm going to get you back" and "you're going to pay" were insufficient to meet the *Rangel* standard because they did not unequivocally threaten violence). As explained in *Rangel*, "hyperbole, rhetorical excesses, and impotent expressions of anger or frustration" can be privileged even if they alarm the addressee. 328 Or at 303 (internal quotation marks omitted). Petitioner asserts that Bosket's statement, "Come down here, motherfucker, and I'll show you[,]" was a "threat" under *Rangel*. However, Bosket's statement was only a vague invitation to fight, which petitioner declined by going into his home, not an unequivocal threat of imminent and serious personal violence.

Petitioner also contends that Bosket's nonexpressive conduct—shaking his clenched fists—constituted a qualifying

contact. We disagree. To the extent that the interaction involved nonexpressive conduct separable from the expressive conduct, we agree with the trial court that respondent's nonexpressive conduct did not give rise to objectively reasonable "alarm." *See, e.g., Brown,* 249 Or App at 581, 584 n 3 (concluding that the respondent's nonspeech conduct—running up to the petitioner aggressively, "clearly angry," with fists clenched and "fury in her eyes"—did not give rise to objectively reasonable "alarm"). Accordingly, the trial court did not err in denying a SPO against Bosket.

We now turn to Carter's interactions with petitioner. Petitioner contends that the trial court erred because Carter made direct threats to physically harm him on at least three separate occasions. In addition, petitioner argues that several of Carter's interactions—such as when Carter approached petitioner in his carport and threatened petitioner while shaking his fist—included nonexpressive conduct, as well as expressive conduct, which was objectively alarming under ORS 30.866.

Under our standard of review, we must determine whether the evidence was legally sufficient to support the trial court's denial of the SPO. The trial court did not specify which incidents it relied on when it determined that there were not two qualifying contacts, but it reasoned that

> "I don't think that it would be objectively reasonable for a person to believe the way [petitioner] believe[s] * * * [because] what you have to believe is not that they're upset, not that it's not offensive, but that they're actually going to be harmed * * * because that's what stalking is about.
>
> "* * * * *
>
> "I also find that * * * the unwanted contact there was replete with [a] situation where it was really communicative * * *."

As we interpret it, the trial court made two distinct conclusions. First, the trial court concluded that the interactions between Carter and petitioner were not qualifying contacts because it would not be objectively reasonable for a person in petitioner's situation to have been alarmed as required by ORS 30.866(1)(b). Second, it concluded that the

unwanted interactions between petitioner and Carter were expressive and, because they were not "threats" under the *Rangel* standard, did not constitute qualifying contacts. We disagree with both conclusions. Because we determine that there were at least two qualifying contacts that were nonexpressive that would cause objectively reasonable alarm, we reverse.

Assuming that Carter's expressive contacts did not meet the *Rangel* standard for threats, there were at least two nonexpressive contacts that, when considered in context with Carter's expressive conduct, meet the statutory standard of causing objectively reasonable alarm. *See Blastic*, 248 Or App at 419; *Habrat*, 208 Or App at 237; *Castro*, 194 Or App at 14. As mentioned, "alarm" is "apprehension or fear resulting from the perception of danger." ORS 163.730(1). "We understand 'danger,' as used in ORS 163.730(1), to refer to a threat of physical injury, not merely a threat of annoyance or harassment." *Brown*, 249 Or App at 586. We conclude that at least two of Carter's nonexpressive contacts, when considered in context with his use of homophobic slurs and vague expressions of violence, would alarm an objectively reasonable person and, therefore, the trial court erred in denying the SPO against Carter.

We first note that on August 10—when Carter tried to run down petitioner with his bicycle—it was objectively reasonable for petitioner to be alarmed for his personal safety. Therefore, we conclude that that encounter was the first qualifying contact.

As for the second qualifying contact, we agree with petitioner that Carter's actions on August 18—when he approached Kirk and petitioner, who were in their carport, with clenched fists—were not purely expressive in nature, and that the nonexpressive conduct constituted a qualifying contact. Because we rely on the nonexpressive conduct when analyzing whether it was a qualifying contact, we need not consider whether the expressive conduct satisfied the additional requirements under *Rangel*. *See Castro*, 194 Or App at 15-16. Petitioner argues that, on that occasion, Carter's actions of standing in the parking lot shaking his fist while angrily yelling at petitioner as petitioner drove into the

parking lot, and then angrily approaching petitioner with clenched fists as he was getting out of his car in his carport was a qualifying nonexpressive contact. We agree.

The act of "coming into" petitioner's "visual [and] physical" presence constituted a nonexpressive contact. *See* ORS 163.730(3)(a). Taken in isolation, this contact may not have been enough to cause objectively reasonable alarm; however, when analyzed in the context of the expressive contacts, the record does not support the trial court's determination that it was not objectively reasonable for petitioner to have been alarmed and apprehensive for his and Kirk's personal safety. Less than a week before this interaction, Carter had tried to run down petitioner with his bicycle and told petitioner that he would be off the HOA board by Sunday or he would "be dead." In addition, merely two days before this interaction, petitioner heard Carter yell to Bosket, "They're going to pay for what they've done," while Bosket was strangling him in his home. Finally, almost every interaction that Carter had with petitioner starting with the July 31 incident was replete with homophobic slurs. Accordingly, we conclude that, when Carter angrily approached petitioner in his carport yelling with clenched fists, it was objectively reasonable for petitioner to have been alarmed.

In sum, we conclude that there was only one possible qualifying contact between petitioner and Bosket, and, consequently, that the trial court did not err in denying that SPO. However, we conclude that the trial court erred in denying petition for a SPO against Carter because there were two interactions that were qualifying contacts that caused subjective alarm in petitioner, and that alarm was objectively resonable.

Judgment in A149922 reversed and remanded; judgment in A149923 affirmed.