Argued and submitted August 1, reversed December 4, 2019

D. O.,
*Petitioner-Respondent,*

*v.*

Eli Franklyn RICHEY,
*Respondent-Appellant.*

Multnomah County Circuit Court
17SK02618; A166855

456 P3d 348

Respondent, a self-identified citizen journalist and police watchdog, appeals a judgment and stalking protective order (SPO) prohibiting contact with petitioner, a police chief. He contests the sufficiency of the evidence supporting the SPO, arguing that the SPO erroneously relied on constitutionally-protected speech, and that petitioner failed to prove that her alarm was objectively reasonable. *Held*: The record contains insufficient evidence to permit issuance of an SPO. Petitioner offered three potential contacts to support her request, two of which involved expressive communication and nonexpressive conduct that failed to meet the respective standards for causing objectively reasonable alarm. Because the first two encounters cannot serve as requisite contacts, the record contains insufficient evidence of repeated unwanted contacts, regardless of whether the third incident could qualify.

Reversed.

Adrienne C. Nelson, Judge.

Jesse Merrithew argued the cause for appellant. Eli Franklyn Richey filed the opening brief *pro se*. On the reply brief were Jesse Merrithew and Levi Merrithew Horst PC.

Denis M. Vannier argued the cause and filed the brief for respondent.

Before Lagesen, Presiding Judge, and DeVore, Judge, and Powers, Judge.

DeVORE, J.

Reversed.

**DeVORE, J.**

Respondent appeals a judgment and stalking protective order (SPO), prohibiting contact with petitioner, a police chief. Respondent contests the sufficiency of the evidence supporting the SPO. He argues that the SPO erroneously relied on constitutionally protected speech and that petitioner failed to prove that her alarm was objectively reasonable. We agree with respondent as to two of the three contacts and need not consider the third contact. As a result, we conclude that the evidence does not suffice to support an SPO. We reverse.[1]

Because this is not an "exceptional case" warranting *de novo* review, we review the trial court's factual findings for "any evidence" and its legal conclusions for errors of law. *See* ORAP 5.40(8)(c) (*de novo* review only in exceptional cases); *Miley v. Miley*, 264 Or App 719, 720, 335 P3d 853 (2014). In doing so, we view the evidence, as well as all reasonable inferences that we draw from it, in the light most favorable to granting the petition. *Delgado v. Souders*, 334 Or 122, 134, 46 P3d 729 (2002).

FACTS

Respondent is a self-described citizen journalist and police watchdog (or "Cop Watcher"). He has been known to film on-duty police officers and to post those videos online. Petitioner, a chief of a police department, became aware of respondent's activities after joining the police department, when she received a briefing on individuals with arrest records or probation conditions related to unwanted contact with public officials. Petitioner learned that respondent had visited the home of the district attorney wearing a ski mask, as well as visited the home of the previous police chief. Petitioner was informed that, as part of a criminal judgment, respondent had probation conditions restricting his proximity to the personal residences of government officials and that respondent had been accused of violating some probation conditions in that case.[2] Petitioner was also told that

---

[1] Respondent's alternative arguments need not be addressed.

[2] The judgment on that alleged probation violation, of which the trial court took judicial notice upon petitioner's request, determined that respondent was *not* in violation of his probation conditions.

respondent had made a comment to a female police officer "that was inappropriate and sexual in nature," and that he had filmed and made a "sexually inappropriate comment" to a woman with a stroller, leading the woman to file a police report.

Petitioner sought the SPO against respondent, pursuant to ORS 30.866, after multiple personal encounters, all of which were captured on video. The first, which we will refer to as the "street encounter," occurred on December 8, 2017. Petitioner testified that, at that time, she was walking downtown from the City Hall to the police department's central precinct, accompanied by two male city staff. She was on duty, displaying her badge, and armed with a firearm. Petitioner noticed respondent when she heard him yelling from across the street. She made out a name, an acronym, "something like Nazi," and "wheel of fortune," but otherwise could not distinguish his words. Hoping to avoid respondent, petitioner and her companions waited to cross and continued walking down the block. Respondent trailed on the other side of the street, appearing to film. When petitioner and her companions reached the end of the block, they decided to cross. The companions stepped in front of petitioner "to create a buffer" between her and respondent.

Respondent's video began around that point in the encounter. It started with petitioner and her companions on the opposite side of the intersection, waiting to cross. Twenty-five seconds passed. Petitioner, in uniform, was talking on her cellular phone. Respondent waited in silence. When the pedestrian traffic signal changed, petitioner and her companions stepped out into the street. As they did, respondent shouted, apparently in reference to the pedestrian traffic signal shown in the video's frame, "These aren't always working. Just to throw it out there." As petitioner approached, respondent addressed her by her title, speaking loudly:

"[RESPONDENT]:    [O]n, uh, April—on June 27th, I was assaulted, and the [police department] told the media that I was part of the assault. Um, also, um, officers booked a man named Timothy Dennis into custody—Multnomah County—under my name. Uh, any comment?

"[Addressing petitioner's companions] Are you her handlers? No? One—two—

"I'm just wondering who you—I'm, I'm really interested to say I wanted to make it a better place—and, and, and, and, and, and, and, and, and—I hope you guys see that.

"[PETITIONER]:   Thank you.

"[RESPONDENT]:   Have a good afternoon.

"[PETITIONER]:   Have a good evening.

"[RESPONDENT]:   Good evening—correct! Look at that, dude. I'm telling you. That's good."

At that point in the video, petitioner entered the building of the police department's central precinct, her companions kept walking down the sidewalk, and respondent went in another direction. Still recording, respondent said into the microphone, "Two minutes. Chief [petitioner]. She's out of here. It's a good video, you guys." He continued, "And so I filmed the police, you guys. Because it's necessary. And not everybody could do it." The video concludes soon after.

The video showed that respondent appeared to maintain a six- to eight-foot distance between himself and petitioner throughout the exchange. Respondent walked ahead of petitioner and her companions with the camera pointing back in their direction. The entire video lasted two minutes, of which, 50 seconds was the time that elapsed between petitioner crossing the street and entering the precinct building.

Petitioner testified that she found that encounter alarming for several reasons. She cited respondent's "screaming" and following her from across the street. Once petitioner crossed the street, she noted respondent "plac[ing] himself in front of [her]," having the "camera in front of [her] face," and his failure to "create a very significant distance between the two of [them]." Petitioner said that respondent engaging in that conduct "told [her] that he was there with the intent to do something far more than to provide [her] with information, or inform [her] of any police accountability

matters." She said that he "wasn't whispering, he wasn't speaking in a normal conversation[al] voice." Petitioner also highlighted respondent's height, over a foot taller than her own, and her "inherent knowledge of him."

The second encounter, which we will refer to as the "Safeway encounter," occurred on a Sunday afternoon two days later. Petitioner was shopping with a family member at a Safeway grocery store downtown, about a half-mile from the police department's central precinct. Petitioner testified that they were preparing to leave and waiting for an elevator when someone addressed her by her title. It was a "friendly voice" that "sounded welcoming." Although petitioner was dressed in civilian clothing and not wearing a uniform, she was neither surprised nor alarmed that a member of the public would recognize and approach her. Petitioner felt concern, however, once she realized that respondent was that person.

Petitioner testified that both she and respondent seemed surprised to see one another. Respondent said something to the effect of, "[Y]ou usually wouldn't see me like this." Petitioner understood that as a comment on the fact that they were "in a personal space doing personal things." Petitioner responded, "well, we all got to eat." Petitioner observed respondent's demeanor change: "His facial expression immediately went from that of surprise" to "completely flat affect." Respondent "kind of glared" and the tone was "very serious." Respondent replied something to the effect of, "you're right, we do all have to eat." He asked whether petitioner knew who he was, and she answered that she did. Respondent pulled out his cellular phone and appeared to begin filming. He started asking questions, the content of which petitioner could not recall. At that point, the elevator arrived, petitioner and her family member entered, and the door closed behind them.

Safeway's surveillance footage also captured that encounter. It showed petitioner and her family member waiting for the elevator. The video showed respondent approach and stop at a distance of over an arms-length away from the pair. The video, which recorded no audio, depicted petitioner and respondent talking. Respondent remained still

throughout the exchange, except for slight hand movement. Within 10 seconds of respondent's arrival, the elevator door opened. It closed behind petitioner and her family member 20 seconds after that.

Petitioner testified that she found the interaction at Safeway alarming for several reasons. She noted respondent's change to a "very serious" face and tone as he processed her comment, "we all got to eat," and that he "kind of glared" and asked whether she knew who he was, which she found threatening. Her alarm was based, in part, on her existing knowledge of respondent and his prior activities, and it was "heightened" by the presence of her family member, who had not "signed up for the level of scrutiny that this sort of behavior entailed."

Petitioner offered additional evidence to further demonstrate the objective reasonableness of her alarm during the encounters. She called as a witness Officer Miller from the police department's criminal intelligence unit, which investigates threats against police, public officials, and their families. Officer Miller said that respondent was a safety concern. Although he was unaware of having directly interacted with respondent, he had read "police reports related to [respondent's] bizarre behavior," the number of which had increased significantly in recent years. Officer Miller testified that respondent "operates outside the realm of common decency and personal privacy frequently." Specifically, he noted that respondent would film police officers "in the street when they're at work and on duty," arriving to their calls for service and "position[ing] himself in a way that stops the officers from being able to solely focus on the problem at hand," and he would "covertly" film outside their precinct, hiding behind police vehicles. Officer Miller explained that respondent "might use profanity." He also described the same incidents as petitioner in which respondent visited the home of the district attorney wearing a ski mask, and he frightened the woman with the stroller. Officer Miller testified that Cop Watch, a group with which respondent affiliates, has posted the personal information about police online and "made statements about wanting felons that [police] deal with, or criminals that [police] deal with

on the street, to be able to find [them]." Officer Miller said that this information would have been relayed to petitioner.

Officer Miller had downloaded some of respondent's videos from the internet, which petitioner introduced into evidence.[3] Those included respondent's recording of the street encounter, as well as a video of a separate encounter that depicted, in part, petitioner's vehicle, including her license plate number.[4] Respondent had also posted online another video, titled "Professional Liars," shortly before his first encounter with petitioner. It depicted what appeared to be homeless individuals and encampments, and then, in a separate scene, three transit officers arresting someone. In voice over, respondent described his depression stemming from reporting by the "mainstream media." He expressed his intention to "expos[e] those that are responsible for spreading and parroting police reports, police lies," warning specific local journalists and news outlets, "I'm coming for you."[5]

---

[3] Although no one expressly stated when or how petitioner came to know about those videos, a factfinder could infer that she became aware of them through the same channels as the other intelligence, such that the videos could factor into the objective reasonableness of her alarm.

[4] As we explain below, the details of that third encounter are not necessary to our analysis.

[5] Officer Miller interpreted respondent's monologue as expressing "suicidal ideation" and as "threaten[ing]" members of the media. The entire narration, which the trial court heard, was as follows:

"I hope this is the last and final take of this. This is just a small little message that needs to be made and it's for the mainstream media here in [the city].

"Today is December 8, 2017, and it is another morning where I wake up feeling like I want to climb into a hole, like I don't want to get out of bed, like I want to smash something into my skull. I hate feeling this way. I hate depression.

"I haven't always felt this way. And this time, the depression's not stemming from the actions of the [city police bureau]—I'm sure that plays a role in my feelings today—but today, I feel as if I've done a pretty good job of documenting the lies and the mis—the abuse that I've received from [the city police bureau]. Unfortunately, I have done a terrible job of exposing those that are responsible for spreading and parroting police reports, police lies.

"And so that is what this video is about. This is what this message is about. This is my message to the mainstream media—that I'm coming for you. [Journalist], I'm coming for you. [Another journalist], I'm coming for you. Your news directors, your editors, [listing three of the city's local newspapers]. Every time I see my name in a news report or a piece that has been parroted—that parrots the police reports, that shows no investigative

In addition, Officer Miller's downloads included a series of video clips that respondent had posted online from a public event at which petitioner spoke. Respondent divided the video into 12 separate segments by topic. Officer Miller testified that the volume of clips, in light of the "totality of the circumstances" and "all of the reports," demonstrated a "fixation" with petitioner.

Finally, petitioner requested that the trial court take judicial notice of the criminal case associated with respondent's probation conditions restricting his proximity to the residences of government officials.[6] In particular, she requested that the court take judicial notice of "the fact that there was already a judgment on a probation violation allegation from December 14th of 2017." Petitioner did not explain that the judgment had found respondent *not* in violation of his probation conditions.[7] The court took judicial notice.

At the conclusion of her case, petitioner explained her reason for requesting an indefinite SPO:

"I think it's important for this [SPO] to occur because if there is no actions taken by the Court, these actions on behalf of [respondent] will continue. There's no apparent understanding of what's reasonable, what personal space is, what private space is, and there's no delineation between private life and personal or public life."

After petitioner rested, the trial court offered respondent the opportunity to testify before closing arguments. Respondent seemed unclear about the distinction between providing testimony and making a closing argument, and he opted to forgo testifying.

---

journalism, who've written about me, without asking me, without interviewing me? I'm coming for you.

"It's time I share with my audience who you are. This is Son of Hightower. Feeling a little bit better now. This will be the final cut of that message, this message to you. Fuck the press. Be the media. 100 percent, U.S.A., FTP. It's not even a fucking joke."

[6] In that case, respondent pleaded no contest to second-degree criminal trespass, ORS 164.245. The trial court dismissed the remaining charges for telephonic harassment, ORS 166.090, and obtaining a communication to which he was not a participant without the consent of a participant, ORS 165.540.

[7] Respondent attempted to alert the court to this fact, but failed to do so at a point in the proceedings when he would be permitted to present evidence.

The trial court entered a final SPO and judgment based on the following findings:

"[The court is] finding that [respondent] engaged in intentional and knowing and reckless repeated unwanted contact with the petitioner or member of the petitioner's immediate family or household; that [respondent] should have known or knew that the repeated contact was unwanted; that she was alarmed by this unwanted contact; that it was objectively reasonable in the petitioner's situation to have been alarmed of course by the contact, and this contact caused reasonable apprehension concerning personal safety and safety of a member of her immediate family, and was a credible threat to the physical safety of the person in this—in this order."[8]

The SPO required respondent to cease any contact or attempted contact with petitioner, including, in part: coming into petitioner's visual or physical presence; communicating with petitioner by any means, including electronically, in writing, or through a third person; communicating with a third person who has some relationship to petitioner with the intent of affecting that relationship; waiting outside petitioner's home, property, or place of work; and filming and posting video of petitioner or her personal information. The court clarified that these conditions meant, among other things, "[n]o more filming outside of central precinct." The judgment would be in effect indefinitely.

Respondent appeals the SPO and judgment. He argues that the record contained insufficient evidence for the trial court to conclude that petitioner's alarm was objectively reasonable. Respondent contends that the court erroneously relied on speech that did not constitute a threat and therefore was privileged.

## PRESERVATION OF ERROR

Before we address those substantive arguments, petitioner urges us to consider whether they were properly preserved. We are satisfied that they were. On multiple occasions, respondent questioned the reasonableness of

---

[8] The trial court provided no further indication as to what specific facts it found or what particular words or conduct served as qualifying unwanted contacts. Accordingly, we consider all of the evidence in our discussion.

petitioner's fear and, at the end of trial, he challenged the issuance of the SPO, arguing that "the State hasn't reached the burden to prove *** that these contacts raised the level of concern that would reach the standard of stalking." Respondent also informed the trial court that he had "the right to film the police while they're on official duty," citing a case holding that the First Amendment to the United States Constitution protects the filming of government officials engaged in their duties in public. *Glik v. Cunniff*, 655 F3d 78 (1st Cir 2011). Respondent asserted that the Oregon Constitution similarly guaranteed such rights, and that harassment cannot be purely verbal.[9] Those statements sufficed to alert the trial court and petitioner to respondent's arguments that (1) the record contained insufficient evidence to meet the statutory standard for objectively reasonable alarm and (2) his expressive activity was constitutionally protected and could not, alone, serve as an element for issuance of an SPO.

## LAW

We turn to the merits of respondent's appeal. The SPO in question was issued pursuant to ORS 163.738.[10] Under that statute, a trial court may enter an SPO if it finds by a preponderance of the evidence that:

"(i)   The person intentionally, knowingly or recklessly engages in repeated and unwanted contact with the other person or a member of that person's immediate family or household thereby alarming or coercing the other person;

"(ii)   It is objectively reasonable for a person in the victim's situation to have been alarmed or coerced by the contact; and

---

[9] We understand that argument to be a reference to Article I, section 8, of the Oregon Constitution. *See State v. Moyle*, 299 Or 691, 701, 705 P2d 740 (1985) (concluding harassment law was facially constitutional under Article I, section 8, in part, because it does not punish communication unless it has the harmful effect of causing reasonable alarm); *State v. Rangel*, 328 Or 294, 302-03, 977 P2d 379 (1999) (discussing *Moyle* and reaching a similar conclusion with respect to the criminal stalking statute); *Delgado*, 334 Or at 142 n 11 (extending the reasoning in *Rangel* to the civil stalking law). *See also State v. Walker*, 350 Or 540, 549, 258 P3d 1228 (2011) ("[A]dducing particular authorities is not a prerequisite to preservation.").

[10] Petitioner sought the SPO under ORS 30.866, which applies the same standard for determining when an SPO is justified.

"(iii)   The repeated and unwanted contact causes the victim reasonable apprehension regarding the personal safety of the victim or a member of the victim's immediate family or household."

ORS 163.738(2)(a)(B). The statute requires that there have been two or more unwanted contacts with petitioner or a member of her immediate family within a two-year period, and that each of those contacts gives rise to objectively reasonable alarm. *Christensen v. Carter/Bosket*, 261 Or App 133, 139, 323 P3d 348 (2014).

Generally, for the purposes of the statute, "alarm" means "to cause apprehension or fear resulting from the perception of danger," ORS 163.730(1), with "danger" referring to "a threat of physical injury, and not merely a threat of annoyance or harassment," *King v. W. T. F.*, 276 Or App 533, 538, 369 P3d 1181 (2016) (citing *Brown v. Roach*, 249 Or App 579, 586, 277 P3d 628 (2012) (brackets omitted)).

"A more stringent standard" applies when we evaluate the sufficiency of the evidence of alarm for expressive contacts, because they implicate Article I, section 8, of the Oregon Constitution and the First Amendment to the United States Constitution. *Ragsdale v. Fleming*, 265 Or App 342, 349-50, 336 P3d 534 (2014). The Supreme Court has explained that, in defining alarm, the legislature necessarily contemplated that speech-based contact could comprise an element of stalking only if it "constitutes a threat." *State v. Rangel*, 328 Or 294, 303, 977 P2d 379 (1999). Thus, as a matter of statutory construction, "[i]f the contact in question amounts to communication by speech or writing, only a threat will be sufficient to 'cause apprehension or fear resulting from perception of danger,' as ORS 163.730 requires." *Id.*[11]

The Supreme Court elaborated on the meaning of the term, "threat." The court observed that only communication that meets "specific factual criteria" can demonstrate a threat for the purpose of the statute because, "in a number of settings, vigorous advocacy of conflicting viewpoints may

---

[11] ORS 163.730 has seen several amendments since the Oregon Supreme Court construed it in *Rangel*, none of which changed the definition of alarm.

create feelings of anger, fear, annoyance or loss of control." *Id.* It must be "communication that instills in the addressee a fear of imminent and serious personal violence from the speaker, is unequivocal, and is objectively likely to be followed by unlawful acts." *Id.* (citing *State v. Moyle*, 299 Or 691, 703-05, 705 P2d 740 (1985)). It excludes "'the kind of hyperbole, rhetorical excesses, and impotent expressions of anger or frustration that in some contexts can be privileged even if they alarm the addressee.'" *Id.* (quoting *Moyle*, 299 Or at 705). That construction of threat, the court concluded, was "faithful" to the legislative intent behind ORS 163.730(1). *Id. See also Delgado*, 334 Or at 142 n 11 (extending the reasoning in *Rangel* to the civil stalking law); *Hanzo v. deParrie*, 152 Or App 525, 542, 953 P2d 1130 (1998), *rev den*, 328 Or 418 (1999) (same, but citing *State v. Rangel*, 146 Or App 571, 934 P2d 1128 (1997), *aff'd*, 328 Or 294 (1999)).

Our opinion in *Hanzo* illustrates the line between protected expression and threats.[12] 152 Or App 525. The petitioner in that case was the executive director of a health center that provided gynecological care and related services, including abortions. *Id.* at 527. The clinic had been the target of a mail bomb about 10 years before the contacts at issue. *Id.* The respondent was the leader of anti-abortion group and the editor of an anti-abortion magazine. *Id.* That magazine had editorialized that "the use of godly force is morally justified in defense of innocent life." *Id.* at 527 (internal quotation marks omitted). In a similar vein, the respondent had signed declarations and made public statements of support for activists who had been violent towards and killed abortion providers. *Id.* At least one co-signatory to such a declaration murdered a doctor and other people. *Id.* at 528. The respondent had been arrested twice for trespass in connection with protests at abortion clinics, but the

---

[12] We issued our decision in *Hanzo* before the Supreme Court decided *Rangel*. In *Hanzo*, we relied on our analysis from *State v. Rangel*, 146 Or App 571, 934 P2d 1128 (1997), *aff'd*, 328 Or 294 (1999), in concluding that, to cause alarm under ORS 163.730, a speech-based contact must involve a threat, as articulated in *Moyle*. 152 Or App at 541-44. Ultimately, the Supreme Court agreed with that conclusion. *Rangel*, 328 Or at 303. Likewise, in *Hanzo*, we concluded that our construction of the criminal stalking statute in *Rangel* applied equally to the issuance of a civil SPO. *Hanzo*, 152 Or App at 542. The Supreme Court confirmed that to be true in *Delgado*, 334 Or at 142 n 11.

record contained no evidence that the respondent had been convicted or that he had ever committed or incited violence against abortion providers. *Id.* The respondent had organized and participated in anti-abortion protests at petitioner's clinic. *Id.* At some point, respondent helped initiate a campaign targeting the petitioner directly at her personal residence, the goal of which was to "bring anti-abortion efforts 'home' to petitioner's personal life and personal space." *Id.* at 528-29.

Six related incidents would later give rise to the petitioner's stalking complaint. First, a copy of the respondent's magazine was left on the petitioner's doorstep and distributed throughout her neighborhood. *Id.* at 529. Second, a postcard associated with the respondent's anti-abortion group was delivered to the petitioner's home. *Id.* at 529-30. Third, the respondent led nine protestors to picket the public streets and sidewalks in front of the petitioner's home. *Id.* at 530. They distributed handbills in the petitioner's neighborhood bearing her picture, name, home address, and work telephone number, captioned, "Your neighbor is an abortionist." (Boldface and uppercase omitted.) The handbills encouraged readers to write or call to "[l]et her know that you think she should not kill children for a living." *Id.* Fourth, a flyer was mailed to the medical director of the petitioner's clinic, listing the names, pictures, and contact information of abortion providers, including the petitioner. The flyer stated, "These abortionists have been exposed!" and highlighted its picketing, leafleting, and "other activities protected by the First Amendment." *Id.* at 531 (uppercase omitted). The flyer stated that they intended to "continue these activities," and promised, "If you're an abortionist we will be visiting your neighborhood soon!" *Id.* (uppercase omitted). It also urged readers to "use whatever influence you have to convince them to practice real medicine in keeping with their Oath." *Id.* Fifth, the respondent called the petitioner at her unlisted home phone number. *Id.* at 532. The petitioner told the respondent to never call in the future, and he complied. *Id.* Sixth, the respondent and a group of 10 to 15 protesters picketed in the petitioner's neighborhood once more, distributing pamphlets. *Id.* That time, the petitioner, with companions, initiated a heated

but nonviolent exchange with the protestors, including the respondent. *Id.* The protest, as before, was peaceful, and none of the slogans, picketing signs, or pamphlets called for violence.

The petitioner sought an SPO against the respondent. *Id.* at 534. She asserted, in relevant part, that the six incidents caused her alarm and that her alarm was objectively reasonable in light of the respondent's consistent declarations of support for those committing violence against abortion providers, as well as the nationwide escalation of such violence, particularly on the part of certain anti-abortion groups. *Id.* at 535. The trial court issued a permanent SPO, identifying the two demonstrations outside of the petitioner's home as the predicate contacts. *Id.* at 535-36. It concluded that the petitioner's alarm was objectively reasonable given "the intensity of the contacts and their potentially violent and confrontational nature." *Id.* at 536.

The respondent appealed, asserting that the issuance of a permanent SPO on the basis of those contacts offended free speech protections of the state and federal constitutions. *Id.* We agreed.[13] We observed that there was nothing unambiguously or unequivocally threatening about the two demonstrations. *Id.* at 544-46. As to the first protest, we noted its limited duration and size, the absence of physical interaction, and that none of the written materials advocated violence. *Id.* at 544. As to the second protest, we highlighted its peaceful and lawful character, the presence of a uniformed police officer, and that the only interpersonal interaction was instigated by the petitioner and was devoid of threats. *Id.* at 546. Again, the written signs and pamphlets did not advocate violence. *Id.* Neither demonstration could constitute an unwanted contact for the purposes of obtaining an SPO. *Id.* Likewise, we determined that the remaining four incidents could not constitute unwanted contacts. *Id.* at 546-47. Nothing in the magazine, postcard, or flyer advocated violence. *Id.* We acknowledged that the phone call to the petitioner's home was "hardly innocuous," in that it conveyed to the petitioner that "even her private

---

[13] We made no distinction between Article I, section 8, and the First Amendment in our analysis.

phone number was not private, that she had 'no place to hide' from respondent's anti-abortion efforts." *Id.* at 547. Nevertheless, we concluded that, "[a]lthough such harassment was, no doubt, upsetting, it did not unambiguously and unequivocally communicate a determination to injure petitioner[.]" *Id.*

In reaching those conclusions, we rejected the petitioner's argument that the demonstrations were alarming given the broader context of violence against abortion providers by anti-abortion groups and the respondent's support for, and affiliations with, people who committed such violence. *Id.* at 544-45. We said that, even if the declarations that respondent signed could have been reasonably read as advocating violence against abortion providers, "that advocacy is abstract advocacy." *Id.* at 545. We noted that nothing in the stalking statutes, as construed in case law, "suggests that such advocacy alone, or even when coupled with manifestly nonviolent protest activity, can constitute an actionable 'unwanted contact.'" *Id.* Otherwise, we reasoned, any contact between the petitioner and the respondent would, necessarily, become an actionable unwanted contact "by virtue of respondent's generic and constitutionally protected statements." *Id.* In other words, the respondent's endorsement of manifestos would "effectively, preclude him from engaging in any picketing/protest activity * * * against *any* abortion provider." *Id.* (emphasis in original). We underscored that the respondent had not personally committed or incited violence. *Id.* Accordingly, because the incidents involved expression that did not rise to the level of a threat, they were not objectively alarming such that they could constitute contacts for the purposes of seeking or granting an SPO.

We reached the opposite conclusion in *Layne v. MacDonald*. 267 Or App 628, 633, 340 P3d 773 (2014). In that case, an ex-husband telephonically promised his ex-wife that he would "fuck [her] up." *Id.* at 629. We considered whether that promise constituted a threat and concluded that it did. We determined that the promise was an "unequivocal" threat because it "used a colloquial term that, in context, has but one meaning." *Id.* at 632. We also noted that, given

the context, the threat presented an immediate and serious danger of harm that was likely to be followed by unlawful acts. Specifically, we explained that the ex-husband had assaulted the ex-wife during their marriage, he bragged that he killed people while serving in the military and warned that he could do the same to her, he repeatedly showed a willingness to break the law by allegedly violating his no-contact order multiple times, he threatened to send his "skinhead" friends to harm her if she reported those violations, and he actually had "skinhead" acquaintances. *Id.* at 633. Under the circumstances, the ex-husband's promise to his ex-wife to "fuck [her] up" was a credible threat of imminent serious physical harm that could support an SPO. *Id.*

## INSUFFICIENT EVIDENCE

Considering the case at hand, we conclude that the record contains insufficient evidence to permit the issuance of an SPO. Petitioner offered three potential contacts to support her request. The first two, referenced above as the street encounter and the Safeway encounter, involve expressive communication and nonexpressive conduct that fail to meet the respective standards for causing objectively reasonable alarm. Because we conclude that those first two encounters cannot serve as requisite contacts, the record contains insufficient evidence of repeated unwanted contacts, regardless of whether the third encounter could qualify. *See* ORS 163.738(2)(a)(B) (requiring repeated unwanted contacts for issuance of an SPO); ORS 163.730(7) ("'Repeated' means two or more times."); *Valerio v. Valerio*, 224 Or App 265, 271, 197 P3d 1124 (2008) (declining to analyze the sole remaining incident in light of the two-contacts requirement).

With respect to the street encounter, neither respondent's expression nor his nonexpressive conduct gave rise to objectively reasonable alarm. As for expression, his speech and filming did not communicate a threat of imminent violence. *Rangel*, 328 Or at 303. The encounter started with respondent shouting a name, an acronym, "something like Nazi," and "wheel of fortune" from across the street. When petitioner crossed the intersection and could distinguish his words clearly, respondent raised issues related to traffic safety and policing. Meanwhile, respondent filmed

petitioner, who was in uniform and on duty on a public side-walk outside her precinct.[14] Both parties exchanged remarks wishing one another a good evening and went their separate ways. Although petitioner may have found it concerning that respondent was "screaming" from across the street and he "wasn't whispering" or "speaking in a normal conversation[al] voice" after she crossed, nothing respondent said threatened violence. *See Gunther v. Robinson*, 240 Or App 525, 529, 248 P3d 20 (2011) (insofar as incidents "involved only screaming, without a threat, they do not support issuance of an SPO"). The expression involved in the street encounter did not unequivocally communicate a determination to inflict imminent and serious personal violence on petitioner, nor did it suggest that unlawful acts would likely follow. *Id*.

To the extent that the street encounter involved nonexpressive conduct separable from the expression, that nonexpressive conduct did not give rise to objectively reasonable alarm.[15] Petitioner failed to show how respondent trailing a city block and then walking in front of her as he filmed would reasonably "cause apprehension or fear resulting from the perception of *** a threat of physical injury." *King*, 276 Or App at 538 (citations and internal quotation marks omitted). Notable here is the absence of evidence from

---

[14] It is well established across jurisdictions that photographing and filming government officials while they are conducting official duties in public is integral to—and, in and of itself, a form of—expression. *Fields v. City of Philadelphia*, 862 F3d 353, 355-56 (3d Cir 2017); *Turner v. Lieutenant Driver*, 848 F3d 678, 688 (5th Cir 2017); *Gericke v. Begin*, 753 F3d 1, 7 (1st Cir 2014); *Am. Civil Liberties Union of Ill. v. Alvarez*, 679 F3d 583, 595 (7th Cir); *cert den*, 568 US 1027 (2012); *Glik*, 655 F3d at 85; *Smith v. City of Cumming*, 212 F3d 1332, 1333 (11th Cir), *cert den*, 531 US 978 (2000); *Fordyce v. City of Seattle*, 55 F3d 436, 439 (9th Cir 1995); *State v. Russo*, 141 Haw 181, 192, 407 P3d 137, 148 (2017); *Ramos v. Flowers*, 429 NJ Super 13, 33, 56 A3d 869, 882 (App Div 2012); *Felkner v. Rhode Island Coll*, 203 A3d 433, 451 (RI 2019); *Pickett v. Copeland*, 236 So 3d 1142, 1146 n 2 (Fla Dist Ct App 2018). Accordingly, such activity must satisfy the *Rangel* standard to constitute an unwanted contact supporting an SPO.

[15] Even "[i]f the expressive conduct does not qualify as a threat under *Rangel*, that communication can still provide relevant context for the nonexpressive contact." *Christensen*, 261 Or App at 141-45 (the respondent's conduct of shaking his fist, yelling, and then angrily approaching the petitioner with clenched fists would alarm an objectively reasonable person "when considered in the context of his use of homophobic slurs and vague expressions of violence"). In the case at hand, respondent's expression provides no support for concluding that his nonexpressive conduct would give rise to objectively reasonable alarm.

which one could reasonably infer that those behaviors would foreshadow future physical harm. *See Braude v. Braude*, 250 Or App 122, 130, 279 P3d 290 (2012) ("[C]onduct that might appear benign when viewed in isolation can take on a different character when viewed either in combination with or against the backdrop of one party's aggressive behavior toward the other[.]"); *compare Miller v. Hoefer*, 269 Or App 218, 224-25, 344 P3d 121 (2015) (the petitioner failed to show her apprehension was objectively reasonable where the contact consisted of her former boyfriend following her and she presented no evidence as to what she feared he might do or what harm he might cause), *with Smith v. Di Marco*, 207 Or App 558, 564, 142 P3d 539 (2006) (the respondent following and peering at the petitioner through binoculars could serve as predicate contacts for an SPO given his history of threatening language and physical confrontations). Although petitioner felt uncomfortable having respondent in front of her with his camera, and although she would have preferred that he keep "a very significant distance," the video showed that respondent maintained several feet of space and that he never obstructed her passage. In short, the nonexpressive conduct involved here is not such that petitioner could have reasonably feared physical injury. *King*, 276 Or App at 538 (citing *Brown*, 249 Or App at 586).

The surrounding circumstances of the street encounter do not provide further support for the objective reasonableness of petitioner's alarm. *Sparks v. Deveny*, 221 Or App 283, 292, 189 P3d 1268 (2008) (considering whether the circumstances surrounding the contact give rise to concern). Here, the encounter was brief, lasting only a couple of minutes, and it took place in the bustling downtown of a sizeable urban area in broad daylight. *See Delgado*, 334 Or at 125-26 (when "no other people were nearby and when [the respondent] was walking in a large, unobstructed area," he "silently and swiftly" walked up behind the petitioner in very close proximity and then quickly walked away and made "side glances" in her direction). Petitioner was armed with a firearm and in a group that outnumbered respondent, and they were in the immediate vicinity of the central precinct to the police department.

In addition, there is nothing inherently alarming about a concerned citizen nonviolently questioning a public officer, who serves in a leadership position in the community, about issues of public concern related to that officer's official duties. To be sure, public officials are entitled to the same level of safety and security as private citizens, but petitioner's public role is relevant to our inquiry into whether the encounter was objectively alarming insofar as it provides some context for the interaction. *See Christensen*, 261 Or App at 141 (noting that "it is often necessary to view contacts in context in order to determine whether they give rise to objectively reasonable alarm," and concluding that the trial court did not err in considering neighbors' relationship). The encounter involved the sort of peaceful and lawful exchange that officials in positions like petitioner's commonly face and expect in going about their work. Respondent addressed petitioner by her formal title, and he inquired into issues related to her official business while she was in uniform and on duty in a public place near the building where she worked. The exchange was within the bounds of what is tolerated, for instance, in everyday journalism, activism, and civic engagement (regardless of whether respondent was actually engaged in such activity). In light of respondent's otherwise nonviolent words and conduct, it was not objectively reasonable to anticipate "danger" under the circumstances. ORS 163.730(1).

Our assessment is similar with respect to the Safeway encounter; neither respondent's verbal expression nor other conduct gave rise to objectively reasonable alarm.[16] As for respondent's verbal expression, he did not communicate a physical threat that was "imminent," "unequivocal," and "objectively likely to be followed by unlawful acts." *Rangel*, 328 Or at 303 (citing *Moyle*, 299 Or at 703-05). He addressed petitioner by her formal title and commented on their unusual meeting, agreed that "we all got to eat," and then asked questions, none of which were alleged to involve threats. Although respondent's demeanor quickly shifted from friendly and surprised to serious, and although he

---

[16] In reaching this determination, we have considered the nonexpressive conduct with communications as part of context in understanding that conduct. *See* 301 Or App at 34 n 15.

glared, such "impotent expressions of anger or frustration" are privileged "even if they alarm the addressee." *Id.* at 303 (quoting *Moyle*, 299 Or at 705).

In light of that context, we also conclude that the nonexpressive aspects of the Safeway encounter were not enough to cause objectively reasonable alarm. When respondent came into petitioner's presence, he maintained several feet of distance between himself and petitioner, and he stood still, moving his hand only slightly and displaying his cellular phone. From an outsider's perspective, the volume of the exchange and respondent's behaviors were so unremarkable that bystanders within the immediate vicinity—including a female patron a couple of feet away, a woman with a small child, and a store clerk—failed to notice. Respondent's nonexpressive conduct did not suggest that he posed a "threat of physical injury." *King*, 276 Or App at 538 (citing *Brown*, 249 Or App at 586).

The duration and surroundings of the Safeway encounter also lend no support for the objective reasonableness of petitioner's alarm. It was over within 30 seconds, and it occurred at a busy grocery store downtown in the middle of the day. Although the Safeway encounter differed from the street encounter in that it occurred when petitioner was off-duty and on private property, petitioner herself acknowledged that it was not unusual or concerning for a member of the public to recognize and contact her in such a setting; it is relatively ordinary for someone in petitioner's public position. Although respondent approached petitioner off-duty, he was engaging with her public persona, addressing her by her formal title. The record contains no evidence to suggest that respondent's presence was unlawful, and respondent did not follow petitioner beyond the Safeway store or otherwise indicate an intent to further intrude into her private life.[17]

Petitioner contends that the encounters were objectively alarming in light of respondent's other activities and affiliations. Specifically, petitioner cites the "Professional Liars" video, critiquing the mainstream media, and the 12

---

[17] The third contact, which we do not discuss, occurred immediately after the second in the parking garage of the same store.

clips from the public speaking event. Petitioner contends that the videos show that respondent had threatened harm to himself and others and had a "fixation" with petitioner in particular. Petitioner highlights respondent's connection to Cop Watch, "a group that has displayed policer officers' personal information on various social networking sites and made statements inviting criminals to use that information to find [them]." (Internal quotation marks and brackets omitted.) She notes that the police department had labeled respondent a "safety concern" and that he posted a video online that, in part, depicted her vehicle's license plate number.

Petitioner's arguments bear a strong resemblance to those advanced in *Hanzo*, and we reject them for similar reasons. 152 Or App at 545-47. First, none of the videos petitioner cites advocate or threaten violence. In "Professional Liars," respondent did not threaten to harm members of the media. His statement, "I'm coming for you," when analyzed within the context of his surrounding statements regarding the need to "expose" those who spread "police lies" and to "[b]e the media," is reasonably understood as a promise to hold the media accountable through his own reporting. Respondent's statement is similar to that of anti-abortion activists in *Hanzo* who, on a flyer, "committed to the regular exposure of abortionists through peaceful, non-violent activism," and promised to visit abortion providers in their neighborhoods. *Id.* at 531. Respondent's video was no more violent and threatening than that flyer which, we determined, did not present a qualifying threat for purposes of the SPO statute.

Neither the clips, the video depicting petitioner's vehicle and license plate, nor the postings of Cop Watch espoused violence. Significantly, none of them contained any threats. As for the clips, respondent's access to, and interest in, that footage of the public-speaking event does not give rise to objectively reasonable alarm; it was a public event involving a public official who is a leader in a subject area of particular importance to respondent. Nor is there anything foreboding about respondent dividing the footage into separate segments by topic. People regularly do such editing for practical, creative, and satirical purposes. There is nothing

objectively alarming, by itself, about such scrutiny of public officials speaking in public. With respect to the video depicting the car, petitioner's suggestion that respondent might incite people to use the portrayal of her license plate number to find or harm her is purely speculative on this record. Even the Cop Watch's postings, which shared the personal information of police and *did* encourage contact, are indistinguishable from the anti-abortion materials disseminated in *Hanzo*, which publicized the private addresses and telephone numbers of abortion providers and urged contact. As before, we conclude that such calls to action, in isolation and absent other evidence suggestive of violence, do not rise to the level of a threat justifying an SPO.

We emphasize, as in *Hanzo*, the lack of evidence that respondent had been violent in the past. The record contains no evidence to suggest that respondent ever personally committed or incited an act of violence, whether against petitioner, other law enforcement officials, other public officials, or anyone else. Officer Miller vaguely referenced police reports, but he never specified what they entailed. Although police found respondent's behavior "bizarre," and although they found his presence distracting when he filmed them on duty, no one alleged that he had committed a crime or caused harm beyond mere "annoyance." *King*, 276 Or App at 538 (citing *Brown*, 249 Or App at 586); *see also, e.g.*, ORS 162.247 (interfering with a peace officer). As in *Hanzo*, respondent's known criminal record consists of only criminal trespass, a property offense.[18] At the time of the SPO hearing, respondent had not violated his probation conditions. The record of this case contains no evidence suggesting a repeated willingness to break the law such that it would be reasonable to expect unlawful acts would likely follow. Respondent's lewd comments to women were not purported to involve any threats. Although the police labeled respondent a public-safety concern for the purposes of their work, the record contains no evidence that the label was based on expression or conduct threatening or causing physical injury to others. To the extent that respondent's support for Cop Watch is

---

[18] Unlike in *Hanzo*, however, we know that respondent was convicted of the offense.

offered as grounds for inferring that he advocates violence, "that advocacy is abstract advocacy"; the mere affiliation with, or endorsement of, individuals or groups who may be violent is, alone, insufficient to make otherwise nonviolent expression a basis for an SPO. *Hanzo*, 152 Or App at 545.

At trial, petitioner's reason for seeking the SPO was not respondent's past or potential violence, but, rather, his lacking an "apparent understanding of what's reasonable, what personal space is, what private space is," and there being "no delineation between private life and personal or public life." In other words, she sought the SPO because respondent pushed the boundaries of personal space. However, as illustrated in *Hanzo*, the fact that petitioner was in the private sphere during the contacts is not, alone, dispositive. Although respondent may have violated social norms, "merely unsettling, unusual, or unpleasant" contact is not enough to support an SPO. *King*, 276 Or App at 541 (quoting *Huber v. Landolt*, 267 Or App 753, 760-61, 341 P3d 175 (2014)). Properly analyzed, respondent's actions cannot constitute unwanted contacts absent a threat of physical injury. In sum, the activities and affiliations that petitioner cites cannot serve as predicate contacts for an SPO, and they provide no basis for concluding that respondent's non-expressive conduct meets the statutory standard.

In reaching this decision, we do not ignore the challenges that petitioner and similar officials face in their work. We recognize that "vigorous advocacy of conflicting viewpoints may create feelings of anger, fear, annoyance or loss of control." *Rangel*, 328 Or at 303. Thus, *Rangel* provides the standard to which we adhere: If respondent's contact with petitioner "amounts to speech or writing," it will suffice to cause "alarm" for the purposes of an SPO when, but *only* when, it involves a threat, *i.e.*, "communication that instills in the addressee a fear of imminent and serious personal violence." *Id.* (citing *Moyle*, 299 Or at 703-05). That standard protects petitioner's safety as well as respondent's rights.

## CONCLUSION

In the end, petitioner failed to meet her burden required of expressive and nonexpressive contacts under

ORS 163.738(2) and ORS 163.730. The record contains insufficient evidence to have permitted the trial court to issue an SPO.

Reversed.