Argued and submitted December 20, 2018, affirmed June 10, 2020

C. P.,
*Petitioner-Respondent,*
*v.*
Brock Robert MITTELBACH,
*Respondent-Appellant.*

Washington County Circuit Court
17SK01905; A166230

468 P3d 496

Respondent challenges the sufficiency of the evidence supporting the permanent stalking protective order that petitioner obtained against him. *Held*: The evidence was sufficient for the trial court to conclude, as required under ORS 163.738(2)(a)(B), that respondent had engaged in repeated and unwanted contacts with petitioner with the requisite mental state (intentionally, knowingly, or recklessly) and that petitioner's alarm and apprehension regarding her or a family member's personal safety, arising from the contacts, were objectively reasonable.

Affirmed.

Theodore E. Sims, Judge.

Andy Simrin argued the cause for appellant. Also on the brief was Andy Simrin PC.

Rolf C. Moan, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Ortega, Presiding Judge, and Lagesen, Judge, and James, Judge.

ORTEGA, P. J.

Affirmed.

**ORTEGA, P. J.**

Appealing from a permanent stalking protective order (SPO) that petitioner obtained against him, respondent challenges the sufficiency of the evidence supporting the SPO.[1] We conclude that the evidence was sufficient for the trial court to conclude, as required under ORS 163.738(2)(a)(B), that respondent had engaged in repeated and unwanted contacts with petitioner with the requisite mental state (intentionally, knowingly, or recklessly) and that petitioner's alarm and apprehension regarding her or a family member's personal safety, arising from the contacts, were objectively reasonable. Therefore, we affirm.[2]

*De novo* review is neither requested nor warranted. *See* ORAP 5.40(8)(c) (only in "exceptional cases" will we exercise our discretion to try a cause anew). As such, we review the trial court's factual findings for any evidence and legal conclusions for errors of law, viewing the evidence and all reasonable inferences drawable therefrom in the light most favorable to the issuance of the SPO and assessing whether, when so viewed, the record is legally sufficient to permit that outcome. *Christensen v. Carter/Bosket*, 261 Or App 133, 135, 323 P3d 348 (2014) (viewing record in light most favorable to court's disposition). We state the facts consistently with those standards.

Petitioner is a top Oregon Department of Corrections (DOC) official. Respondent is a former DOC correctional officer. From July 2016 until March 2017, the parties' interactions consisted almost exclusively of (over 57) emails that respondent had sent to DOC management, including petitioner, raising work-related issues. One email, for example, concerned respondent's discontent with the prospect of requiring correctional officers to work 12-hour shifts. Petitioner always rerouted respondent's emails "back through his chain of command." On March 1, 2017, respondent began

---

[1] Pursuant to ORAP 5.15(1), we refer to the parties by their designation in the trial court.

[2] Our conclusion that the record was sufficient to support issuance of the SPO and the applicable standards of review in this case obviate the need to separately discuss defendant's first assignment of error—that the trial court erred in denying his motion for a directed verdict, brought after petitioner had rested her case.

to attend evening mass at petitioner's church. Petitioner, who had been an active member of the church since 2004, had never seen respondent there before, and she did not recognize him until respondent approached her during the mass to introduce himself.[3] At the time, petitioner did not think much of the matter. However, between that incident and respondent's termination on June 30, 2017, a series of interactions at the church that were initially unremarkable eventually led petitioner to contact the Oregon State Police (OSP) for dignitary protection, a service provided to public officials confronted with threats.

On March 17, 2017, respondent was placed on administrative leave for alleged misconduct related to excessive overtime work. He emailed petitioner and asked that she call him at the number provided because he trusted only her. Although petitioner would not normally be involved in the disciplinary process of a "line employee" who was "six or seven layers down" the chain of command, she made the call after consulting her deputy and out of concern for respondent's well-being. Respondent was "incredibly upset" on the call and "crying, almost uncontrollably." Petitioner testified:

> "[Respondent] discussed that his life was over, that he absolutely could not lose his job. His job was his everything. That's where all his friends were. He didn't have friends outside of the agency.
>
> "He had lost two relationships *** because of the job, that he needed to support his children ***. *** [H]e said that he didn't even have [it] in him to turn his vehicle on."

Worried that respondent was suicidal, petitioner asked a colleague to drive him home and to check his place for weapons; she knew that, as a correctional officer, respondent owned and was trained to use firearms. With respondent's consent, petitioner also contacted the church to reach out to respondent with support resources.

A couple of weeks later, petitioner saw respondent at church, and he looked very distraught. After mass, petitioner

_____

[3] The parties had briefly met in person once before, when respondent was staffing the gates at a DOC facility and petitioner was conducting a site visit. Petitioner had forgotten about the encounter until respondent reintroduced himself at the church on March 1.

approached respondent and asked how he was doing. After respondent answered, "Not doing very well," petitioner offered him a "professional hug." Respondent "held on for just a little bit too long as [petitioner] pulled away. His hands moved down to [her] waist and rested there for a second." Petitioner did not say anything to respondent at the time, attributing the conduct to his emotional state, but she reported that incident to her husband, her deputy, and the inspector general.

Shortly after the hugging incident, while saying goodbye at the end of mass, respondent looked at petitioner and said that he "really like[d] [her] nail color[.]" That comment struck petitioner as "incredibly odd" and prompted her to walk away. At another mass, respondent approached petitioner from behind, such that she could not see him in her periphery, and he placed his hand on the small of her back and brushed it around her side, causing petitioner to jump, startled. He handed her a card and then left.[4]

At several masses, respondent would "stand and stare" at petitioner until petitioner's friends and family "peel[ed] off" before approaching her alone. On April 16, 2017, for example, respondent sat directly behind petitioner and her family at church but otherwise did not approach her while her husband was around. After petitioner's husband left, respondent drove up to her in the parking lot and appeared to "fish[]" for an invitation to Easter brunch. Petitioner testified that she did not realize how "stressful" respondent's attendance at mass nearly every Sunday had been for her, until she experienced how "incredibly peaceful" it felt when he first missed a mass.

During a special mass in early June 2017, petitioner, who is a eucharistic minister, sat in a reserved area so that she could easily access the altar to help serve communion. Halfway through the mass, respondent arrived and climbed over the back of a pew to sit about three spots from petitioner in the reserved area, causing a disturbance. When it was time to kneel, respondent made a move to a seat

---

[4] The record suggests that the "nail color" incident occurred on April 9, 2017. The date of the "card" incident is unclear from the record. Petitioner testified that she "remember[s] specific events, but not necessarily specific dates."

closer to petitioner, who reacted by reaching for her pepper spray and phone. Respondent also tried to hold petitioner's hand during a moment in the program when such practice was normal, but she denied his attempt. Several times, respondent aggressively tried to talk to petitioner about his disciplinary hearing ("My papers are being delivered tomorrow. What does that mean?") and insisted that she had the authority to make the final decision in the process ("Well, you're going to be there. You're the final say, right?"). Despite petitioner's response that she was not involved in the process, respondent's insistence that the final decision rested with her was a recurring theme. Later, as petitioner served communion, respondent stared at her coldly and unrelentingly. Respondent's behavior frightened petitioner, prevented others from interacting with her, and caused her to make a mistake while serving communion.

Several people told petitioner that they also found respondent's behavior disconcerting. Once when respondent was not at mass, petitioner's young daughters spontaneously expressed that they were glad for his absence, because his glares made them very uncomfortable. When petitioner recounted the preceding incidents to an experienced public safety official, Sinclair, he advised petitioner to immediately request dignitary protection, because respondent was exhibiting "textbook stalking" behavior. Petitioner heeded that advice, and OSP Detective Wilson was assigned to the case. After petitioner described to him respondent's behavior, Wilson opined that respondent was far more brazen at that point than the stalker in a high-profile case who ultimately went to the workplace of the victim (also a public official) with intentions to kidnap, rape, and murder her and to dispose of her body.

On June 30, 2017, respondent was fired. That same day, per petitioner's request, Wilson informed respondent that his behavior had caused petitioner fear and, "just to be clear, she doesn't want any more contact with you." Wilson explained that respondent could still go to church and do "any of the things that you normally do"; "[t]he only thing that * * * we're asking you not to do is just physically contact her, you know, or even go up to her and * * * literally touch her or contact her, * * * call her, email, * * * those types of things."

Respondent acknowledged understanding petitioner's perspective: "[I]f I'm in her shoes, a female, * * * a guy knows right where the church, he's having issues at work, yeah, I—I get it." He agreed to stop contacting petitioner.

Despite that initial agreement, however, respondent engaged in behavior on two subsequent occasions that would form the basis for the SPO. First, on July 16, 2017, Wilson and another officer provided protection to petitioner when she attended church. While the two officers were outside, respondent approached them to shake their hands. Inside, respondent chose a seat where he could direct a cold, unrelenting stare at petitioner for an "inordinate amount of time." Afterward, respondent "mirror[ed]" petitioner's movements in an apparent attempt to orchestrate an occasion in which they would walk out together: When she stopped to talk to someone, he stopped to talk to someone; when she headed for the exit, he headed for the exit. Petitioner waited for respondent to leave first, but he paced around near the door and then sat in his truck for "what seemed like a really long time" before finally driving away.

Second, on September 3, 2017, petitioner attended church with her daughters, as usual, and respondent brought his sons, which was less usual. While petitioner's 13-year-old daughter was in a reserved room preparing for her duties as an altar server, respondent momentarily poked his head in, looked at her, and then addressed the deacon: "I just need to let you know there's a State Police detective sitting behind." Petitioner was terrified that respondent had briefly been in her daughter's vicinity while she and the officers were elsewhere. Later, respondent pointed out petitioner, her daughters, and the officers to his sons. As before, he sat where he could stare at petitioner during the entire mass. After mass ended, respondent positioned himself near the door and continued staring at petitioner.

By the time of the September incident, petitioner had read Wilson's report on his investigation. That report stated that, after the July incident, Wilson had had a follow-up conversation with respondent, during which respondent appeared agitated, retributive about his termination, and contemptuous toward petitioner, making "conspiracy-type"

allegations for why she was, in his view, accusing him of stalking. Petitioner learned that respondent had previously expressed a desire to kill his ex-wife, his ex-fiancée's husband, and his two sisters. The report also described incidents in which respondent had tried to intimidate other people with his presence and glares.

Petitioner sought an SPO. At the evidentiary hearing, petitioner, Wilson, and respondent's ex-fiancée testified on petitioner's behalf to the above-described facts. The trial court made the necessary findings under ORS 163.738 (2)(a)(B) and issued the SPO. Respondent appealed.

ORS 163.738(2)(a)(B) provides that the court may enter a permanent SPO if it finds, by a preponderance of the evidence, that

> "(i)   The [respondent] intentionally, knowingly or recklessly engages in repeated and unwanted contact with the other person or a member of that person's immediate family or household thereby alarming or coercing the other person;

> "(ii)   It is objectively reasonable for a person in the victim's situation to have been alarmed or coerced by the contact; and

> "(iii)   The repeated and unwanted contact causes the victim reasonable apprehension regarding the personal safety of the victim or a member of the victim's immediate family or household."[5]

The statute requires at least two unwanted contacts. ORS 163.730(7) ("'Repeated' means two or more times."). Each contact, individually, must give rise to subjective alarm, and that alarm must be objectively reasonable.[6] *T. B. v. Holm*, 248 Or

---

[5] Although this case involves an SPO issued under ORS 163.738 rather than ORS 30.866, both statutes require the same evidentiary showing. *See Delgado v. Souders*, 334 Or 122, 132 n 4, 46 P3d 729 (2002) (so stating). Therefore, case law discussing ORS 30.866 is equally applicable to our consideration of this case.

[6] ORS 163.738(2)(a)(B)(ii) requires the petitioner to be subjectively alarmed or coerced and that alarm or coercion to be objectively reasonable. As to coercion, petitioner did not testify, and no evidence in the record indicates, that she was subjectively coerced by the contacts. *See* ORS 163.730(2) ("'Coerce' means to restrain, compel or dominate by force or threat."). Therefore, we do not evaluate whether the circumstances would have given rise to objectively reasonable coercion.

App 414, 418, 273 P3d 304 (2012). "Alarm" means "to cause apprehension or fear resulting from the perception of danger." ORS 163.730(1). "Danger," in turn, refers to "a threat of physical injury, [and] not merely a threat of annoyance or harassment." *Reitz v. Erazo*, 248 Or App 700, 706-07, 274 P3d 214 (2012). Finally, the contacts, cumulatively, must give rise to subjective apprehension regarding the petitioner's personal safety or the personal safety of a member of the petitioner's immediate family or household, and that apprehension must be objectively reasonable. *T. B.*, 248 Or App at 418.[7]

On appeal, respondent does not dispute that the July and September incidents constitute "repeated and unwanted contacts."[8] *See* ORS 163.730(3) (defining "contact" nonexhaustively); *King v. W. T. F.*, 276 Or App 533, 538, 369 P3d 1181 (2016) ("The term 'contact' includes 'almost any interaction with the petitioner.'" (Quoting *Christensen*, 261 Or App at 140.)). Nor does respondent challenge the trial court's conclusion that the contacts caused petitioner subjective alarm and apprehension. Rather, respondent argues that petitioner failed to establish (1) that he engaged in the contacts with the requisite mental state (intentionally, knowingly, or recklessly) and (2) that petitioner's alarm and apprehension were objectively reasonable.[9]

First, we readily conclude that respondent engaged in both of the unwanted contacts with the requisite mental state. Respondent contends otherwise, emphasizing that,

---

[7] An additional requirement applies to "expressive contacts," that is, speech-based contacts. In those circumstances, the petitioner also must prove that the expressive contacts involved threats that "instill[] in the addressee a fear of imminent and serious personal violence from the speaker, [are] unequivocal, and [are] objectively likely to be followed by unlawful acts." *State v. Rangel*, 328 Or 294, 303, 977 P2d 379 (1999). Petitioner does not allege that the contacts at issue are expressive in nature.

[8] Although the trial court did not specify which contacts provided the basis for its issuance of the SPO, the parties' trial and appellate arguments and the court's explanation for its ruling indicate that they mutually understood these to be the qualifying contacts.

[9] Respondent does not precisely set out his arguments regarding the objective reasonableness of petitioner's alarm arising from a particular contact, ORS 163.738(2)(a)(B)(ii), and the objective reasonableness of petitioner's apprehension arising from the contacts cumulatively, ORS 163.738(2)(a)(B)(iii)—two overlapping but distinct requirements of the stalking statute. However, we understand him to have raised both arguments and proceed with that understanding.

since June 30, he had "literally" followed Wilson's instructions to not approach, talk to, or touch petitioner. Given that literal compliance, respondent argues, he cannot be said to have acted intentionally, knowingly, or recklessly, as ORS 163.738(2)(a)(B)(i) requires.

In context, however, those specific types of contacts were but examples that Wilson had given at one point in a larger conversation in which he repeatedly and unequivocally informed respondent that petitioner did not want *any* further contact from him. At the very least, the trial court was entitled to conclude that respondent was "aware of and consciously disregard[ed] a substantial and unjustifiable risk" that petitioner did not want him to contact her by other means as well, such as by positioning himself in her path, staring at her unrelentingly, and mirroring her movement to orchestrate a close-proximity encounter. ORS 161.085(9) (defining "recklessly"). Evidence that respondent would engage in prolonged staring as an intimidation tactic further shows that he knew it was unwanted behavior. We conclude that, when respondent engaged in the July and September contacts, he did so with the requisite mental state.

Next, we address respondent's contention that petitioner's alarm and apprehension were not objectively reasonable, as required by ORS 163.738(2)(a)(B)(ii) and (iii). As discussed above, each "contact," individually, must give rise to objectively reasonable alarm, and those contacts, cumulatively, must give rise to objectively reasonable apprehension regarding petitioner's or her family member's personal safety. We conclude that petitioner's alarm arising from the July contact, her alarm arising from the September contact, and her apprehension arising from the contacts cumulatively were all objectively reasonable. We discuss each conclusion in turn.

With respect to the July contact, respondent argues that his act of shaking hands with the officers was innocuous and that staring is not an objective basis for alarm. However, "conduct that might appear benign when viewed in isolation can take on a different character when viewed either in combination with or against the backdrop of one party's aggressive behavior toward the other." *J. L. B. v.*

*K. P. B.*, 250 Or App 122, 130, 279 P3d 290 (2012) (citation omitted). On that day, aside from greeting the officers and staring at petitioner for an "inordinate" amount of time, he "mirrored" her movements in an attempt to encounter her in close physical proximity, and he waited a long time before leaving.

   In addition, although respondent's earlier acts may not constitute qualifying contacts, they nevertheless provide relevant context. *See, e.g.*, *Habrat v. Milligan*, 208 Or App 229, 237, 145 P3d 180 (2006) ("[I]n considering the effect of th[e] contacts on petitioner and on a reasonable person in petitioner's position, we may consider as context respondent's persistent and inappropriate sexual overtures, along with his directive and demanding style of interaction."). At the time of the July contact, the context relevant to considering the objective reasonableness of petitioner's alarm include that respondent was going through an emotionally challenging period, having recently been fired; he expressed to petitioner that he viewed her as having had the authority to influence that employment decision; he had been inappropriately intimate toward her on three occasions; he would wait to approach her when she was alone; he had once disruptively climbed over a pew in the middle of mass to sit near her; he would stare at her unrelentingly; he had been informed by the police that his behavior frightened her; and he had acknowledged understanding her fear. Furthermore, the concerns of petitioner's daughters, Sinclair, and Wilson, as well as petitioner's awareness of their concerns, are noteworthy. *See, e.g.*, *Habrat*, 208 Or App at 239 (other people's concern for the petitioner and their fear of the respondent add to the reasonableness of the petitioner's alarm). In light of the foregoing, it was objectively reasonable for petitioner to be alarmed by respondent's contact in July.

   With respect to the September contact, petitioner's alarm was again objectively reasonable—for the above-discussed reasons regarding the July contact and the additional reason that she had read Wilson's report stating that respondent was increasingly antagonistic toward her, that he had expressed wanting to kill people with whom he was angry, and that he had used the same tactics of staring and imposing his presence to intimidate other people. Also, at

that point, the police had reached out to respondent twice to inform him of petitioner's fear. That respondent disregarded the warnings, persisted in the complained-of behavior, and even came around petitioner's daughter while petitioner and the officers were elsewhere added to the objective reasonableness of petitioner's alarm at that contact.

Finally, we conclude that petitioner's apprehension regarding her or a family member's personal safety, arising from the preceding contacts cumulatively, was objectively reasonable. Respondent argues to the contrary, contending that the record lacked any evidence that he had been violent or had used firearms against anyone; that he had threatened petitioner; or that he had ever followed her home or at her workplace. Respondent describes his behavior as "somewhat boorish, but nonthreatening." Additionally, he argues that petitioner did not give any indication of what she thought he would do to endanger her or her family's personal safety.

"We assess the objective reasonableness of a person's apprehension over personal safety by examining the cumulative effect of the relevant unwanted contacts." *P. M. H. v. Landolt*, 267 Or App 753, 759, 341 P3d 175 (2014) (citing *Christensen*, 261 Or App at 139-40). Respondent's focus on the evidence that is not in the record causes him to overlook the evidence that *is* in the record. To briefly recap, respondent is a recently fired and emotionally distraught former employee who became increasingly fixated on and angry toward petitioner—who was reliably informed that his stalker behavior was particularly brazen—and he repeatedly engaged in unwanted contacts with petitioner at her place of worship, despite police warnings and presence. That distinguishes this case from *Sparks v. Deveny*, in which the petitioner "did not identify any apprehension relating to her or anyone else's personal safety, and *nothing in the record implies such concerns*." 221 Or App 283, 291, 189 P3d 1268 (2008) (emphasis added). Here, the record was sufficient for the trial court to conclude that petitioner's apprehension was objectively reasonable. Accordingly, the trial court did not err in issuing the SPO.

Affirmed.