Submitted May 1, reversed November 25, 2020

M. W. V. H.,
*Petitioner-Respondent,*

*v.*

Kathryn Anne VAN HOFF,
*Respondent-Appellant.*

Benton County Circuit Court
19SK00539; A171214

478 P3d 1012

Respondent appeals from a judgment entering a permanent stalking protective order (SPO), ORS 30.866, against her and for the protection of petitioner, her ex-husband. Petitioner sought the SPO after three separate incidents: respondent's break-in to his unoccupied truck toolbox and theft of his tools; respondent's break-in to the laundry room of his residence and theft of several items; and an encounter in which respondent followed petitioner into a public parking lot. Respondent challenges the sufficiency of the evidence supporting the SPO, arguing that petitioner failed to prove that at least two of respondent's alleged contacts with petitioner caused him objectively reasonable apprehension as to his personal safety or the personal safety of a member of his immediate family or household, as required by ORS 30.866(1)(c). *Held*: The trial court erred because the evidence was legally insufficient to support an SPO. It was not objectively reasonable for two of the three contacts presented to have caused petitioner apprehension regarding his own personal safety, or the personal safety of a household or family member. Therefore, there were not "repeated" qualifying contacts sufficient to issue an SPO under ORS 30.866.

Reversed.

John L. Barlow, Judge pro tempore.

Kathryn Anne Van Hoff filed the brief *pro se*.

No appearance for respondent.

Before Ortega, Presiding Judge, and Shorr, Judge, and Powers, Judge.

SHORR, J.

Reversed.

**SHORR, J.**

Respondent appeals from a judgment entering a permanent stalking protective order (SPO) against her and for the protection of her ex-husband, challenging the sufficiency of the evidence supporting the SPO. She argues that petitioner failed to prove that at least two of respondent's alleged contacts with petitioner caused him objectively reasonable apprehension regarding his personal safety or the personal safety of a member of his immediate family or household, as required by ORS 30.866. We agree with respondent as to two of the three contacts at issue in this case and need not consider the third contact.[1] As a result, we conclude that the evidence was insufficient to support an SPO. We reverse.

We review the facts found by the trial court to determine whether they are supported by any evidence, and then determine whether, as a matter of law, those facts provide a basis for issuing an SPO under ORS 30.866. *Brown v. Roach*, 249 Or App 579, 580, 277 P3d 628 (2012). We view the evidence, and all reasonable inferences that may be drawn from it, in the light most favorable to petitioner. *Delgado v. Souders*, 334 Or 122, 134, 46 P3d 729 (2002).[2]

We state the relevant facts in accordance with the above standard of review. Petitioner and respondent are ex-husband and ex-wife, respectively, and had been divorced for approximately one and one-half years at the time the petition was filed. Respondent had secured a Family Abuse and Protection Act (FAPA) restraining order against petitioner soon after the divorce proceedings began; that restraining order expired a year later and was not renewed. By the time the first alleged stalking predicate contact occurred,

---

[1] Although we do not separately analyze one of the three contacts on its own to determine if it is a qualifying contact under ORS 30.866, we do consider that contact as context for our consideration of the other two contacts.

[2] Respondent invites us to review the facts of this case *de novo*, as permitted by ORS 19.415(3)(b). *De novo* review is used sparingly and reserved for "exceptional cases." ORAP 5.40(8)(c). Furthermore, respondent's primary argument on appeal, as we understand it, is that the evidence presented was legally insufficient to support issuance of the SPO. Because that is an issue of law, we need not review the facts *de novo* to address it. *Brown*, 249 Or App at 580. Therefore, we decline respondent's invitation to review *de novo*.

the parties had not been in contact in some time and petitioner had "moved on" and started a new relationship.

Petitioner sought the SPO after three separate incidents. The first, which we will refer to as the "truck break-in," occurred on November 25, 2018. On that date, petitioner discovered that a locked toolbox in the back of his truck had been broken into while parked outside his residence overnight. Several distinctive items were missing from the toolbox. The locks had been greased and multiple small instruments that appeared to be lock picking tools were left in the truck. Petitioner testified that, at that time, he thought that the theft was likely committed by "a transient." He did not report the incident to law enforcement because he "didn't really see what good that would do." However, petitioner's girlfriend reported the break-in to law enforcement on his behalf. While discussing one of the items that had been taken from his truck, petitioner testified that he "wasn't really all that worried about it and so I just *** went on with my life."

The second incident, which we will refer to as the "laundry room break-in," occurred on December 31, 2018. That evening, a woman knocked on petitioner's door while he was at work. Petitioner's girlfriend answered. Although petitioner's girlfriend had not previously met respondent in person, she had seen pictures of her, and, based on that knowledge, she believed that the woman at her door was respondent. Respondent asked petitioner's girlfriend whether petitioner was home, and petitioner's girlfriend responded that he was not. Respondent then provided a fake name and quickly left.

Soon after the interaction at the front door, petitioner's girlfriend discovered that items were missing from their laundry room, including camping equipment, a military deployment bag, a sweatshirt, and a new bottle of laundry soap. When petitioner returned home, the couple reported the incident to law enforcement, and petitioner's girlfriend told law enforcement that she suspected respondent had stolen the items. Petitioner testified that his girlfriend was "quite concerned and worried," and that he "had a hard time taking it all in." The items missing from both

the truck and laundry room break-ins were subsequently found in a vehicle regularly driven by respondent. Petitioner testified that respondent must have gone "out of her way to find out where [he] live[d]."

The third incident, which we will refer to as the "parking lot encounter," occurred on February 8, 2019. Petitioner was scheduled to attend grand jury proceedings that day in the criminal case that had developed against respondent for the truck and laundry room break-ins. Petitioner was driving to a store and about to turn into a parking lot when he passed respondent driving the opposite direction. Petitioner and respondent made eye contact, and respondent turned around to follow petitioner into the parking lot. Petitioner testified that, as he parked and exited his vehicle, he locked eyes with respondent, who had a "crazed smile on her face." Concluding that "there wasn't really much [he] could do," petitioner entered the store to do his shopping. As petitioner exited the store, he considered calling the police: "We were already on our way that day to a grand jury *** so I was just going to, you know, let [law enforcement] know what I'd seen that day." Then, petitioner spotted respondent again:

> "[A]s I'm getting into my vehicle I look across—there was like a—so it's a fairly large parking lot and I was parked over by the Round Table and I look across this sea of cars, and the only reason why I saw her head is she was wearing a white beanie that day, and I see her head pop up above this sea of cars and it popped back down and I was like that's [respondent], so I ended up calling the police department and notifying them of what was going on."

After calling the police, petitioner lost track of respondent again, and drove his vehicle in a loop around the parking lot to determine whether she was still there. Respondent evidently left and reentered the parking lot in her vehicle during this period, and, when petitioner spotted her, she had just reentered the parking lot and appeared to also be visually scanning the area for petitioner. Petitioner called the police a second time when he realized respondent had returned to the parking lot. He then exited his vehicle and approached respondent's vehicle on foot to film video of respondent. Petitioner testified that he did so because he

wanted "concrete evidence" to forward to the police, who were "looking for" respondent. Petitioner testified that he was "heightened," "alert," and "uncomfortable" during this encounter, but that he felt approaching respondent on foot was "an acceptable risk," commenting that "[s]ometimes in life you have to do things that you're afraid to do." Respondent drove away and was later arrested at her home on a warrant stemming from the previous break-in incidents.

Petitioner presented those three incidents as qualifying contacts to support his petition for an SPO that he filed on March 6, 2019. After granting a temporary SPO, the trial court scheduled a contested hearing to determine if a permanent SPO was warranted. Both parties appeared at that hearing *pro se*. After relaying the three incidents described above, petitioner testified that he felt it was "disturbing" that respondent had "gone out of her way" to find out where he lived. Considering that respondent then used that information to steal from his property on two separate occasions, petitioner said he was "concerned" for his safety and his girlfriend's safety. Respondent made both factual and legal arguments against issuance of the SPO. She argued during closing argument that "I do not believe that the—the actions that [petitioner] claims are enough to constitute the requirements for a stalking protective order," and "because it is insufficient—insufficient * * * I believe that a stalking protective order is unwarranted." The trial court made the necessary findings under ORS 30.866, ruled against respondent, and granted the permanent SPO.

Respondent filed this timely appeal. Her main argument on appeal, as we understand it, is that the trial court erred by issuing a permanent SPO without legally sufficient evidence that it was objectively reasonable for a person in petitioner's situation to have experienced apprehension regarding his personal safety or the personal safety of a member of his immediate family or household.[3] Petitioner waived his appearance on appeal and did not submit a brief.

---

[3] Respondent also assigns error to several of the trial court's findings of fact and rulings excluding certain evidence. We reject those arguments without further discussion.

ORS 30.866 provides that, for an SPO to issue, a petitioner must first show that the respondent intentionally, knowingly, or recklessly engaged in "repeated and unwanted contact" with the petitioner or a member of the petitioner's "immediate family or household." ORS 30.866(1)(a). For purposes of ORS 30.866, "contact" is broadly defined and includes "[c]oming into the visual or physical presence of the other person," "[f]ollowing the other person," "[c]ommunicating with the other person through a third person," and "[c]omitting a crime against the other person." ORS 163.730(3). "Repeated" means "two or more times." ORS 163.730(7). The petition must be filed within two years of the conduct at issue. ORS 30.866(6).

In addition to establishing two or more unwanted contacts, a petitioner must show that he was subjectively "alarmed" or "coerced" by each contact, and that it was "objectively reasonable for a person in the victim's situation to have been alarmed or coerced" by each contact. ORS 30.866 (1)(a), (b). "Alarm" is the "apprehension or fear resulting from the perception of danger," ORS 163.730(1), and "danger" refers "to a threat of *physical* injury, not merely a threat of annoyance or harassment." *Brown*, 249 Or App at 586 (emphasis added). Finally, the petitioner must show that the "repeated and unwanted contact" has caused him "reasonable apprehension" regarding his own personal safety, or the personal safety of a member of his "immediate family or household." ORS 30.866(1)(c). Thus, subjective and objective tests must be applied to each contact individually and cumulatively. In other words, each contact must individually give rise to subjective alarm or coercion, and that alarm or coercion must also be objectively reasonable. *C. P. v. Mittelbach*, 304 Or App 569, 575, 468 P3d 496 (2020). Additionally, the contacts must cumulatively give rise to subjective apprehension regarding the petitioner's personal safety or the personal safety of a member of the petitioner's immediate family or household, and that apprehension must be objectively reasonable. *Id.* at 576. It is the petitioner's burden to prove each element by a preponderance of the evidence. ORS 30.866(7).

Here, the evidence is legally insufficient to support a conclusion that at least two of the three alleged contacts

caused petitioner objectively reasonable apprehension for his own personal safety or the safety of a member of his immediate family or household. Because the trial court did not specify which of the three contacts constituted the basis for the SPO, we would normally consider all three contacts individually. However, because we conclude that the truck break-in and the parking lot encounter are not qualifying contacts under ORS 30.866, and, because petitioner had to establish at least two qualifying contacts to obtain an SPO, we need not discuss whether the laundry room break-in was a qualifying contact. We consider the contacts starting chronologically with the truck break-in.

We conclude that there was insufficient evidence that it was objectively reasonable for the truck break-in to cause petitioner apprehension for his personal safety. Respondent's break-in did not put petitioner or a member of his family or household at any risk of physical injury. Petitioner was not present when the break-in occurred. He did not observe the break-in or interact with respondent. Additionally, petitioner himself initially considered the truck break-in to be inconsequential and believed the break-in was committed by a stranger. It was only later, when the missing items were discovered with respondent and the incident was considered together with the laundry room break-in that the truck break-in developed a greater significance for petitioner. "To be sure, we have recognized that 'conduct that might appear benign when viewed in isolation can take on a different character when viewed either in combination with or against the backdrop of one party's aggressive behavior toward the other.'" *King v. W. T. F.*, 276 Or App 533, 539, 369 P3d 1181 (2016) (quoting *Braude v. Braude*, 250 Or App 122, 130, 279 P3d 290 (2012)). However, even considering those additional facts, there still was no evidence that respondent would seek out a physical conflict with petitioner or attempt to injure petitioner in the future. Respondent accessed the back of petitioner's truck at night outside of petitioner's presence to take personal property. Although this conduct potentially constituted a property crime,[4] it was not accompanied

---

[4] We note that, at the time of the contested SPO hearing in May 2019, the criminal charges respondent then faced for the truck and laundry room break-ins had not yet been adjudicated. For purposes of this opinion, we assume without

by an express or implied physical threat to petitioner. As we have repeatedly held, "[i]n the absence of inherently threatening contacts, something more is required than merely unsettling, unusual, or unpleasant contact." *King*, 276 Or App at 540 (concluding that the respondent's obsessive behavior and persistent contacts at the petitioner's regular coffee shop were not qualifying contacts because they were not threatening in nature and the respondent had no history of violence) (internal quotation marks omitted); *see also Braude*, 250 Or App at 129-31 (the two respondents' behavior in driving by the petitioner's house and photographing it, although "unwelcome and unsettling," was not inherently threatening, and one respondent's history of violence was too isolated and remote to be relevant to the analysis); *Brown*, 249 Or App at 581-87 (the respondent's many angry outbursts, including yelling, running up to the petitioner with clenched fists and "fury in her eyes," and spraying the petitioner's family member with a water hose were not qualifying contacts absent clear threats or violence). Because the truck break-in was not an inherently threatening contact and petitioner presented no other evidence that respondent posed a physical risk, it was not objectively reasonable for this incident to cause petitioner apprehension for his or his girlfriend's personal safety.

We turn to the parking lot incident. On the day of grand jury proceedings arising out of respondent's alleged truck and laundry room break-ins, petitioner was driving and saw respondent turn around to follow him into a parking lot. Respondent then drove by petitioner with a "crazed smile on [her] face." Petitioner did his shopping, exited the store, and then spotted respondent again across a "sea of cars." He testified that "the only reason why" he recognized her from that distance was because of her distinctive hat. Petitioner lost track of respondent when he called law enforcement so he drove a loop around the parking lot looking for her. Finally, once he spotted her again, he exited his vehicle and approached respondent on foot to film her to obtain "concrete evidence" for the police, who were "looking for" respondent.

deciding that the conduct alleged could have been criminal acts. However, as explained below, whether or not the truck and laundry room break-ins are crimes is not dispositive to our analysis because the evidence was otherwise legally insufficient for the issuance of an SPO.

Under those facts, it was not objectively reasonable for petitioner to feel alarm or apprehension for his personal physical safety. While it may have been disconcerting that respondent turned around to follow petitioner and flashed him a "crazed smile," particularly on the day that petitioner was attending grand jury proceedings for respondent's alleged crimes against him, there was no evidence presented from which one could conclude that respondent posed a physical safety risk to petitioner. Respondent did not attempt to run petitioner over with her car. She never approached him on foot. The fact that petitioner lost track of respondent multiple times, and that he at one point only recognized respondent through the "sea of cars" because of her distinctive hat, illustrates the amount of distance between the parties for much of the encounter. Petitioner then approached respondent on foot to film her, not the other way around. Considering those circumstances, it was not objectively reasonable for petitioner to fear for his physical safety in the absence of any signs that respondent was a physical threat to him.

We reach this conclusion considering the parking lot encounter in context, with due consideration of the previous truck and laundry room break-ins as required by our case law. *See Weatherly v. Wilkie*, 169 Or App 257, 263, 8 P3d 251 (2000) (considering contacts within their wider context and noting that contacts that might appear innocuous when viewed in isolation often take on a different character in context). Although we recognize petitioner's legitimate concern upon seeing respondent in the parking lot, especially considering the two preceding potential criminal acts and the upcoming grand jury proceedings, our case law nevertheless requires more than concern. Even when viewed with the additional context of the previous potential crimes, the parking lot encounter still failed to present an objective threat to petitioner's physical safety, or the safety of a family or household member, because of the complete absence of any facts which could infer a risk of physical injury.

Finally, in evaluating whether it is objectively reasonable for a person in the petitioner's position to have been apprehensive for their personal safety, we also consider the wider circumstances of the parties' relationship. *Pinkham v.*

*Brubaker*, 178 Or App 360, 372, 37 P3d 186 (2001) (discussing the importance of viewing contacts within the wider context of the parties' relationship). Here, the parties were divorced somewhat recently and had a history of conflict. However, there was no evidence that respondent had ever threatened or used violence against anyone, let alone petitioner. While a lack of violent history cannot be dispositive on its own, it may appropriately be considered when the contact at issue is not inherently violent or threatening. *See, e.g., King*, 276 Or App at 539-40 (considering the respondent's lack of violent or threatening history in concluding that his repeated unwelcome contacts did not give rise to an objectively reasonable fear for personal safety).

We do not make this decision lightly, particularly considering that two of the three contacts petitioner described in his petition could amount to criminal acts by respondent. Although we do not separately analyze the laundry room break-in, we recognize that many crimes are sufficient to cause a victim objectively reasonable apprehension for their safety because of their very nature. Here, however, even assuming that the laundry room break-in was a qualifying contact, the evidence presented regarding the truck break-in, both on its own and in context, did not meet the legal standard for a qualifying contact under ORS 30.866. A variety of "outrageous," unsettling, and even criminal acts are still nevertheless legally insufficient to function as qualifying contacts if they fail to create objectively reasonable fear for personal safety. *See, e.g., Brown*, 249 Or App at 587 (conduct that resulted in the respondent's arrest for criminal harassment was not a qualifying contact).

In sum, we conclude that the trial court erred in issuing an SPO because it was not objectively reasonable for two of the three contacts presented to have caused petitioner apprehension regarding his own personal safety, or the personal safety of a household or family member. Therefore, there were not "repeated" qualifying contacts sufficient to issue an SPO under ORS 30.866.

Reversed.